# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

## James M. Goodhart v. The Pennsylvania Railroad Company, Appellant.

*Negligence—Railroads—Damages—Evidence—Medical examiner.*

On the trial of an action against a railroad company to recover damages for personal injuries, evidence of rudeness and incivility on the part of the medical examiner of the railroad company in examining the plaintiff's person to ascertain the extent of the company's liabilities is immaterial and irrelevant. The medical examiners are liable for their own cruelty; not the railroad company.

*Negligence—Elements of damages for personal injuries.*

Damages for personal injuries consist of three principal items, first, the expenses to which the injured person is subjected by reason of the injury complained of; second, the inconvenience and suffering naturally resulting from it; third, the loss of earning power, if any, and whether temporary or permanent, consequent upon the character of the injury.

*Measure of damages—Expenses.*

The expenses for which a plaintiff may recover must be such as have been actually paid, or such as in the judgment of the jury are reasonably necessary to be incurred. The plaintiff cannot recover for the nursing and attendance of the members of his own household, unless they are hired servants.

*Measure of damages—Pain and suffering.*

Pain and suffering are not capable of being exactly measured by an equivalent in money, and they have no market price. The question in any given case is not what it would cost to hire some one to undergo the measure of pain alleged to have been suffered by the plaintiff, but what under

all the circumstances should be allowed the plaintiff in addition to the other items of damages to which he is entitled, in consideration of suffering necessarily endured.

An instruction that leaves the jury to regard pain as an independent item of damages to be compensated by a sum of money that may be regarded as a pecuniary equivalent is not only inexact, but it is erroneous.

The word " compensation " in the phrase, " compensation for pain and suffering," is not to be understood as meaning price, or value, but as describing an allowance looking towards recompense for or made because of the suffering consequent upon the injury.

*Measure of damage—Earning power—Profits of business.*

The loss of earning power involves an inquiry into the value of the labor, physical or intellectual, of the person injured before the accident happened to him, and the ability of the same person to earn money by labor, physical or intellectual, after the injury was received. Profits derived from an investment or the management of a business enterprise are not earnings.

Evidence of the profits of the business of a person injured, while it may tend to show the possession of business qualities, does not fix their value, and the admission of such evidence for that purpose is error; and it is also error to treat the subject of the value of earning power as one to be settled by expert testimony.

*Measure of damages—Earning power—Age—Health—Habits.*

In settling the question of earning power the jury should consider not only the plaintiff's past earnings, or the fair value of services such as he was able to render, but his age, state of health, business habits, and manner of living.

In an action to recover damages for personal injuries it appeared that eighteen months before the trial, and after the accident, plaintiff was postmaster in the town in which he lived and received as compensation for his services a substantial sum in addition to his expenses. The court charged: " It seems to the court, and we do not understand that it is denied by the defendant, that since the accident he has been totally disabled and utterly unable to do anything." *Held* to be error.

*Anticipation of future payments.*

When future payments are to be anticipated and capitalized in a verdict, the plaintiff is entitled to only their present worth, which is the exact equivalent of the anticipated sums.

Argued May 25, 1896.    Appeal, No. 170, Jan. T., 1896, by defendant, from judgment of C. P. Mifflin Co., Nov. T., 1894, No. 129, on verdict for plaintiff.    Before STERRETT, C. J., GREEN, WILLIAMS, DEAN and FELL, JJ.    Reversed.    STERRETT, C. J., dissents.

Trespass for personal injuries.    Before WILLIAMSON, P. J.

At the trial it appeared that plaintiff was injured on September 20, 1893, while a passenger on the first section of the Pacific Express on the Pennsylvania railroad in traveling from Harrisburg to his home at Lewistown.

When the plaintiff was on the stand the following offer was made:

Mr. Woods: We offer to prove by the witness and by other testimony that Dr. Morton was sent there by the Penna. R. R. Company to make an examination of Mr. Goodhart; that he was brought there by Dr. Mahon, their physician, in pursuance of their request for Mr. Goodhart to go to Philadelphia to submit to this examination. We propose to prove just what took place in the room at the time the examination was made and the results of it; just what Dr. Morton did. This for the purpose of proving the extent of the injury to the plaintiff, also to show his desire to comply with the requests of the defendant in order to get such relief as they and their experts could give him.

Mr. Elder: It is objected that what took place at this examination was not part of the res gestæ, that the results of the examination can be proved by the physicians, and that it is not alleged by the plaintiff that as a result of that examination his injuries were rendered more severe. What occurred at that examination at that time is not part of the happening of the accident, throws no light on how the injuries were incurred; what occurred at that examination can throw no light upon the extent of the injuries; it is not evidence, as counsel offer to show the extent of the injuries; it is evidence of outside matters which have no bearing on this case and the points at issue in it are irrelevant, immaterial and incompetent.

By the Court: Mr. Goodhart, if he knows it, is permitted to show that Dr. Morton came there as the physician of the def ndant; but as to the result of the examination and what was said and done there there may be a time when that evidence can be offered, but it must be offered after the examination of Dr. Morton. You can show what he did, but not give his opinion. The objection is overruled, the evidence admitted, and a bill sealed for defendant.

Mr. Woods: Go on and state what happened. What Dr. Morton did, not what he said.  A. Dr. Morton took a chair and

called for some writing paper, which Dr. Mahon procured by ringing the bell and calling for it. He then began to ask me questions, and some of the questions I thought had nothing to do with my injuries. I waited awhile but finally, as he continued the questions, I told him that I came there for a medical examination and not for a legal one, and if he persisted in asking such questions as those I insisted upon having my attorney present. He immediately stopped and commanded me to take off my clothes. I told him that this was something I could not do and had not been able to do since my injuries. He said, "Well, try it." I told him, "Doctor, I can't do it." He says, "You have not tried." I says, "I can't, Doctor." At that point Dr. Mahon stepped up and assisted me in taking off my clothes. The room at that time was in a very cold and chilly condition; if I mistake not the gentleman had his overcoat on. Dr. Mahon had I know. I was then placed in the middle of the room standing. He began to examine me; asked me questions about my injuries. This occupied some time. When he turned me around, I noticed another gentleman in the room who had come in unbidden and without any permission on my part, I assure you. I was not introduced to the gentleman, did not know who he was, nor anything about it. But I soon found out from the conversation that he was Dr. or Professor Forbes. This examination went on for some time. The cane with which I supported myself was taken out of my hand and thrown on the floor. Dr. Morton then asked me to stoop down and pick it up. I told him that I could not do it. "Well, try." I told him that there was no use in trying, that I had not been able to stoop down and pick up anything since my injury. Then they proceeded to test or try me with a galvanic battery, electricity. I objected to this on account of my nervous condition. But after the assurance on their part that the battery was very lightly charged, and to assure me of this fact they placed it in my hands and upon my shoulders, I then consented; and this battery was used not only from my feet up to my knees but from my toes to the roots of my hair, over the sore spot on my back and every place else where they could apply it. In the work of this examination my clothes were lying on the floor, my pantaloons had been jerked out of the way by Dr. Morton, and the contents of my pockets were strewn over the floor. I pleaded, as I would plead for my life,

that I be allowed to put my pantaloons on. I was standing there trembling like a leaf, every nerve in my body was unstrung. He said, " Well, go on and put them on." I told him that I could not do it. Dr. Mahon went to pick up my pantaloons and put them on. He said, "Let him do it himself." I could not do it. . . . The gentlemen after making this examination all left the room, allowing me to stand in the middle of the floor with nothing on but a thin undershirt and a pair of stockings, which Dr. Mahon had put on me when I asked to have my pantaloons put on. I want to state here that all this time I was standing. I was not sitting down at all during the whole examination. After they had left I went to the bed. It was lying on the floor where I could not reach it. I crawled to the bed as best I could, and laid down in the bed with nothing to cover my person but a thin quilt. In that condition my wife found me a half hour afterwards. [1]

Plaintiff further testified:

Q. What were your expenses at the hospital? A. At the hospital my expenses were $109.17. Expenses about the house, extra hire and help, were $85.00. I charge twenty-three weeks nursing by my wife, at $10.00 a week, making $230. I charge fifty-four weeks nursing and care, at $6.00 a week, making $324. Bill of examination of Dr. Wood, $25.00; Dr. Harshberger's bill of $118; Dr. Hamilton, $10.00; bill for medicine of $48.02.

Mr. Elder: We object to the admission of the two items there of $230 and $324 for the reason that nursing expenses are such as the plaintiff has either paid or incurred a legal liability for, and in this case he has done neither, and they are consequently inadmissible.

By the Court: The objection is overruled and this testimony so far as it goes to establish that is admitted. Bill sealed for defendant. [3]

Mr. Woods: We offer to prove by this witness that his training was that of a business man and merchant. That he was a clerk in Blymyer's store for a number of years, and afterwards went into business for himself and continued as a merchant up until a short time before this accident happened, and what he was able to earn in his business as a merchant while he was in good health.

Mr. Elder: We object that the plaintiff does not offer to prove what the plaintiff was earning at the time of the happening of this accident, but only refers to a period some time before the accident; that what he was earning at the time of the injury, and not what he was earning at some prior time, is competent in this case.

By the Court: The objection is overruled, the evidence admitted and a bill sealed for defendant. We think that his earning capacity is a question for the jury to take into consideration in establishing what he has lost by the accident.

Mr. Woods: Go on and state when you entered Blymyer's store as a clerk? A. I think it wa in 1862 or 1863. Q. How long were you there? A. Six years. I began clerking for Blymyer at $5.00 a month. Q. After you left Blymyer's what did you do? A. Entered into a partnership with James Ritz Burns and John H. Houtz, in the mercantile business, and established what is now known as the "Iron Front Store." Q. How long did that firm last? A. Until 1875. Q. Then what? A. Then Houtz and I took charge of the business. Q. From the time that you and Mr. Houtz took charge of the business, state whether or not you made a success of it? A. Yes, sir, we made a success of it; we did not make so much of a success previous to that. Q. What was your average earnings during that time? A. I think I may safely say that my average earnings during that time was $2,500 a year, or thereabouts. [4]

James Macklin sworn for plaintiff.

Mr. Woods: We offer to prove by this and other witnesses that Mr. Goodhart was an experienced business man and merchant, and what his earning power as such was; this for the purpose of showing what his earning power as a business man and merchant was.

Mr. Elder: It is objected that what was the earning capacity of the plaintiff is not susceptible of proof by experts, that the witness upon the stand has not shown any knowledge of Mr. Goodhart's business, the profits and losses sustained and the income, from which to enable him to speak; that the admission of testimony of this character would substitute the opinion of the witness for a fact. That what his earning capacity was is susceptible of exact proof in dollars and cents by the books of

the concern, that it is not the best evidence; that it is irrelevant and immaterial and incompetent.

By the Court: The witness having testified that he has known him as a business man for twenty years, the evidence is admitted and a bill sealed for defendant.

Mr. Woods: Will you go on and state what in your judgment Mr. Goodhart's earning power as a business man and merchant would be worth annually? A. In my judgment not less than $2,500. [5]

Q. Do you know how much stock was in the "Iron Front Store" during any of these twenty years? A. No, sir. Q. Do you know what the profits amounted to in any one of those twenty years? A. No, sir. Q. Do you know the amount paid to clerks and for insurance and other incidental expenses of the store during that time? A. No, sir. Q. Then you have no exact knowledge of the amount of money earned in any one year of the twenty that you speak of by the firm of which Mr. Goodhart was a member? A. No, sir. Q. Then how do you pretend to give the earning capacity of one of the partners of that concern without that knowledge? A. I base my knowledge upon my intercourse with Mr. Goodhart as a business man. I know him to be a successful business man. I have had intercourse with him frequently as a business man, and I base my opinion as to his earning capacity upon my knowledge of him as a business man and his reputation ever since in Lewistown as a business man. Q. Then it is not based upon any figures at all? A. No, sir. Q. It is simply an abstract opinion? A. I don't know whether you would call it an abstract opinion or not. Q. Do you know of his filling any $2,500 positions? A. No, sir, but I know of his ability to fill $2,500 positions. Q. Are not there plenty of men capable of filling $2,500 positions that never get into them? A. That may be. Q. Is not what a man actually receives the measure of his ability? A. It may be. And yet if a man has the business ability to earn $2,500, which I believe Mr. Goodhart to have, I believe that that should be the measure of his earning capacity. Q. Although he may live all his life without earning that amount of money? A. I do not believe that he did live all his life or would have lived all his life without earning that amount of

money.   Q. Do you believe that he earned $34,000 during his business at the "Iron Front Store"?   A. I do not know.

Mr. Elder: We move to strike out the testimony of the witness. There is only one theory upon which it would be admissible, and that would be upon the theory that the witness possessed sufficient knowledge of the business and of the matter upon which he spoke. An expert machinist, if he had no knowledge of the machinery of which he spoke, would not be allowed to testify as an expert. A doctor would not be allowed to testify about a man whose symptoms he knew nothing of. This is a fact, dollars and cents, it is not an opinion.

By the Court: The motion is overruled, the evidence is admitted and a bill sealed for the defendant. [6]

John C. Axe, called by plaintiff, testified:

Q. What was Mr. Goodhart's earning capacity in your opinion?

Mr. Elder: I will make the objection that the witness has testified that he knows nothing about the profits of the business in which Mr. Goodhart was engaged, and secondly he has no sufficient knowledge or experience from which to say what his actual earning capacity was, and as still another objection that Mr. Goodhart was not engaged in the business of which the witness was asked to speak at the time of the happening of the accident, but was working upon a salary.

By the Court: Objection overruled, evidence admitted and a bill sealed for defendant.

A. I should think about $2,000 a year. [7]

James C. Hazlett was asked this question:

Q. State what in your opinion is Mr. Goodhart's earning capacity or was his earning power as a merchant and business man.

Mr. Elder: We make the same objection.

By the Court: The evidence is admitted and a bill sealed for defendant.

A. I would think about $2,000 or $2,500. [8]

A. C. Mayes, was asked this question:

Q. Do you know anything about their profits?   A. I used to know from what they would tell me in winding up the year several times what they said they made. I saw the sheets once or twice.

Mr. Elder: We object.

By the Court: He can testify as to what he saw on the sheets but not what they told him. Objection overruled and bill sealed for defendant.

A. I helped to take stock twice in that store.

Mr. Woods: The years that you helped to take stock in that store what did the result show was their profits for the year? A. I helped to take stock right after Burns' death, and if my recollection is not at fault, the profits at that time showed a gain of over $7,000. Q. When did you take the other account of stock? A. Several years after. Q. What did it show up then? A. They showed up a little over $5,000. [9]

Q. From your knowledge of Mr. Goodhart and the business that he was engaged in, please state what his earning capacity was as a merchant and business man?

Mr. Elder: We make the same objection.

By the Court: Objection overruled, evidence admitted and a bill sealed for the defendant.

A. That would be a pretty hard question for me to answer. I think Mr. Goodhart's earning capacity would be equal to mine at any time. Q. What is yours? A. That would be a couple of thousand dollars or more. Q. Two thousand dollars and more? A. Yes, sir. [10]

Albert Spanogle was asked this question:

Q. In your judgment what was Mr. Goodhart's earning capacity as a business man?

Mr. Elder: Same objection.

Objection overruled and bill sealed for defendant.

A. From $2,000 to $2,500 a year. [11]

The court charged in part as follows:

[It seems to the court, and we do not understand that it is denied by the defendant, that since the accident he has been totally disabled and utterly unable to do anything.] [12]

[The plaintiff also called Dr. H. C. Wood, of the city of Philadelphia, who is an eminent specialist on nervous diseases, whose high reputation is well known. Dr. Wood testifies to you that he first saw the plaintiff November 2, 1893, and that he then made a very careful examination of him and prescribed a mode of treatment for him; that he again examined him in

April, 1895, and again during this court, and he gives you the result of his examinations, and tells you that it is his opinion that he has a chronic spinal disease that cannot be cured; and that therefore his injury is permanent.

Dr. Hamilton, a Harrisburg physician, was also called, who tells you that he has been practicing since 1871, and has had under his charge at least three patients with somewhat similar injuries. And he, after examination, agrees with Dr. Wood that the injury is permanent and incurable. Dr. Clarkson and Dr. Harshberger, who is and has been his family physician for years, are both called, and they agree with Dr. Wood. On the other hand the defendant calls Dr. Thomas G. Morton, an eminent surgeon, but who tells you he does not profess to be a specialist on nervous diseases. Dr. Morton tells you he examined the plaintiff November 3, 1893, and that as the result of that examination he does not believe that Mr. Goodhart has any chronic spinal disease such as described by Dr. Wood, but that his trouble is traumatic hysteria, his principal trouble being hysterical, and that it is not permanent and can be cured, and that he believes the plaintiff will finally recover. The defendant also calls Dr. Judson Daland, another Philadelphia physician, who testifies to you that he examined the plaintiff in April, 1895, together with Dr. Forbes, Dr. Walker and Dr. Harshberger, and that he agrees with Dr. Morton that his disease is of a hysterical nature and not permanent. Dr. Forbes, another eminent Philadelphia surgeon, but who tells you he is not a specialist on nervous diseases, is also called and he agrees with Dr. Morton. Dr. Walker, a young Philadelphia physician, is called, who also agrees with Dr. Morton.] [13]

[Plaintiff also claims for the services of his wife for nursing him previous to April court, twenty-three weeks, at $10.00 per week, $230; fifty-four weeks, at $6.00 per week, $324; and since April court, fifteen weeks, at $10.00 per week, $150; fifteen weeks, at $6.00 per week, $90.00, making in all for nursing since the accident to the present time the sum of $794. This part of his bill the defendant disputes. He claims it is too high. You heard from the plaintiff and his wife what this nursing was. You also heard what Dr. Wood said on this subject. The defendant has failed to offer any evidence on this subject; and you will give him what is right in the matter. It

is a question entirely for you, what you think should be right for these services per week. If you are not satisfied with this bill as he makes it, it is a question for you to find what it would be worth.] [15]

Plaintiff's third point and answer were as follows :

3. If the jury find for the plaintiff he is entitled to recover such an amount as will compensate him for his pain and suffering, for any amount of money that he has expended by reason of the injury, for any loss of wages that he has been deprived of or has been unable to earn by reason of the accident, and, if you believe it is a permanent injury, for loss of earning power for the balance of the time that the injury will prevent his working. *Answer :* This point is affirmed. [16]

Defendant's fourth point and answer were as follows :

4. That at the time of the happening of the accident to plaintiff he was engaged as superintendent and manager for a company at a salary of $960 per year, and that is the proper measure of his earning capacity at that time when he was injured. *Answer :* This point is refused. This is important evidence to be considered in making up your verdict, but it is to be taken in connection with the other testimony in the cause in making up your verdict in determining plaintiff's earning capacity. [17]

Verdict and judgment for plaintiff for $28,076. Defendant appealed.

*Errors assigned* were (1–11) rulings on evidence, quoting the bill of exceptions ; (12, 13, 15, 16, 17) above instructions, quoting them ; (14) the court failed to so instruct the jury as to enable them to fairly and intelligently weigh and consider the testimony as to the earning capacity of the plaintiff, and to determine the loss from that source ; (18) the charge as a whole was not a fair and adequate presentation of the case.

*Rufus C. Elder,* with him *George W. Elder,* for appellant.— The evidence as to business profits on the question of earning power was improper : People's Passenger Ry. v. Lauderbach, 4 Penny. 406 ; Bierbach v. Goodyear Rubber Co., 54 Wis. 208 ; Marks v. Long Island R. R., 14 Daly (N. Y.), 61.

Opinions are never received if all the facts can be ascertained

and made intelligible to the jury, nor if they are such as men in general are capable of comprehending and understanding. The ordinary affairs of life cannot be the subject of expert testimony: Franklin Fire Ins. Co. v. Grúver, 100 Pa. 266; Lineoski v. Susquehanna Coal Co., 157 Pa. 173; Graham v. Penna. Co., 139 Pa. 159; Dooner v. Canal Co., 164 Pa. 33. A witness must have special knowledge to qualify him as an expert: Potts v. Aechternacht, 93 Pa. 138; Monongahela Water Co. v. Stewartson, 96 Pa. 439; Ry. Co. v. Vance, 115 Pa. 332; Lineoski v. Susquehanna Coal Co., 157 Pa. 173.

When there is sufficient evidence upon a given point to go to the jury, it is the duty of the judge to submit it calmly and impartially: Burke v. Maxwell, 81 Pa. 153; Penna. Canal Co. v. Harris, 101 Pa. 80.

In the direction to the jury that he was entitled to recover such an amount as will compensate him for his pain and suffering there was error: Baker v. Penna. R. R., 142 Pa. 503.

*Joseph M. Woods*, with him *D. W. Woods*, for appellee.—The evidence as to earning power was proper: Kelley v. Mayberry Twp., 154 Pa. 440; McLaughlin v. Corry, 77 Pa. 113; Louisville & N. R. Co. v. Graham's Admr., 34 S. W. Rep. 229; Ehrgott v. Mayor, 96 N. Y. 264; Keenan v. Getsinger, 37 N. Y. 826; McNerney v. Reading, 150 Pa. 611; Beatty v. Gilmore, 16 Pa. 463; Kraut v. Frankford & Southwark Pass. Ry., 160 Pa. 327; Phillips v. S. W. Ry., L. R. 4 Q. B. D. 46; Penna. & Ohio Canal Co. v. Graham, 63 Pa. 295; Scott Twp. v. Montgomery, 95 Pa. 444; Schneider v. P. R. R., 2 Cent. Rep. 74; Kendall v. Albia, 34 N. W. Rep. 833.

OPINION BY MR. JUSTICE WILLIAMS, July 15, 1896:

The plaintiff received the injury complained of while a passenger on one of the trains of the defendant company. The train was being moved in two sections. The first section, on which the plaintiff was riding, had stopped to repair a break in one of its air pipes, and had sent its flagman back to warn approaching trains. The second section, having been misled by the signal displayed by an operator at a signal tower, came along at full speed, and its engineer failing to notice the flagman and his efforts to warn him of the position of the first section, the

accident resulted and the plaintiff was thrown from his seat
and injured.  At the trial, but two questions were raised, first,
was the accident, and the consequent injury to the plaintiff,
due to the negligence of the employees of the defendant?  If
so, then second, what was the proper measure of damages to be
applied by the jury?  It does not appear that any contest was
made over the first of these questions.  The only real ground
for controversy was over the measure of damages, and the evi-
dence should have been confined to the issues of fact that
related to this controversy.  The evidence in regard to the
examination made by Dr. Morton was not directed to the extent
of the plaintiff's injuries but to the severity of the examination.
Its evident object was to persuade the jury that the character
of the examination and the conduct of Dr. Morton and his
assistants were unnecessarily harsh and annoying, and were
proper subjects to be considered in assessing the plaintiff's dam-
ages.  But it must be borne in mind that a claim was being
made against the railroad company for damages based upon an
alleged injury received in consequence of the accident already
referred to.  In order to determine intelligently the extent of
its liability, it was important for the defendant to know the
nature of the injury, and the extent to which the plaintiff was
affected by it.  This could only be known as the result of a
medical examination made by competent and experienced physi-
cians.  Dr. Morton and his assistants were selected, as proper
persons to make the examination, and advise the defendant
company of their estimate of the plaintiff's condition and its
consequent liability.  If, in the discharge of their professional
duty to their employer, they went beyond what was reasonably
necessary and employed methods and tests that were cruel, and
such as the judgment of the medical profession does not approve,
and thereby inflicted injury on the plaintiff, they are liable for
their own trespass whether committed with malice or through
ignorance.  But rudeness and incivility in the manner in which
the examination was conducted, if rudeness or incivility can be
affirmed of anything that was said or done in that connection,
could throw no light on the extent of the injury actually suf-
fered by the plaintiff, and the evidence referred to in the first
and second assignments of error should have been rejected.

The remaining sixteen assignments of error relate more or less

directly to the single question the case presented, viz : the measure of damages ; and can be most conveniently considered together.   Damages for a personal injury consist of three principal items ; first, the expenses to which the injured person is subjected by reason of the injury complained of ; second, the inconvenience and suffering naturally resulting from it ; third, the loss of earning power, if any, and whether temporary or permanent, consequent upon the character of the injury : Owens v. Peoples Pass. Railway Co., 155 Pa. 334.   The expenses for which a plaintiff may recover must be such as have been actually paid, or such as in the judgment of the jury are reasonably necessary to be incurred.   The plaintiff cannot recover for the nursing and attendance of the members of his own household, unless they are hired servants.   The care of his wife and minor children in ministering to his needs involves the performance of the ordinary offices of affection, which is their duty ; but it involves no legal liability on his part, and therefore affords no basis for a claim against a defendant for expenses incurred.   A man may hire his own adult children to work for him in the same manner and with same effect that he may hire other persons, but in the absence of an express contract the law will not presume one, so long as the family relation continues.   Pain and suffering are not capable of being exactly measured by an equivalent in money, and we have repeatedly said that they have no market price.   The question in any given case is not what it would cost to hire some one to undergo the measure of pain alleged to have been suffered by the plaintiff, but what under all the circumstances should be allowed the plaintiff in addition to the other items of damage to which he is entitled, in consideration of suffering necessarily endured : Baker v. Pennsylvania Company, 142 Pa. 503.   This should not be estimated by a sentimental or fanciful standard, but in a reasonable manner, as it is wholly additional to the pecuniary compensation afforded by the first and third items that enter into the amount of the verdict in such cases.   By way of illustration, let us assume that a plaintiff has been wholly disabled from labor for a period of twenty days in consequence of an injury resulting from the negligence of another.   This lost time is capable of exact compensation.   It will require so much money as the injured man might have reasonably earned in the same time by the pursuit of his ordinary call-

ing.  But let us further assume that these days of enforced
idleness have been days of severe bodily suffering.  The ques-
tion then presented for the consideration of the jury would be,
what is it reasonable to add to the value of the lost time in view
of the fact that the days were filled with pain instead of being
devoted to labor?  Some allowance has been held to be proper;
but in answer to the question "how much?" the only reply yet
made is that it should be reasonable in amount.  Pain cannot
be measured in money.  It is a circumstance however that may
be taken into the account in fixing the allowance that should
be made to an injured party by way of damages.  An instruc-
tion that leaves the jury to regard it as an independent item of
damages to be compensated by a sum of money that may be re-
garded as a pecuniary equivalent is not only inexact, but it is
erroneous.  The word "compensation," in the phrase, "compen-
sation for pain and suffering," is not to be understood as mean-
ing price, or value, but as describing an allowance looking
towards recompense for, or made because of, the suffering con-
sequent upon the injury.  In computing the damages sustained
by an injured person therefore, the calculation may include not
only the loss of time, and loss of earning power, but, in a proper
case, an allowance because of suffering.  The third item, the
loss of earning power, is not always easy of calculation.  It in-
volves an inquiry into the value of the labor, physical or intel-
lectual, of the person injured before the accident happened to
him, and the ability of the same person to earn money by labor
physical or intellectual after the injury was received.

Profits derived from an investment or the management of a
business enterprise are not earnings.  The deduction from such
profits of the legal rate of interest on the money employed does
not give to the balance of the profits the character of earnings.
The word "earnings" means the fruit or reward of labor, the
price of services performed: Anderson's Law Dictionary, 390.
Profits represent the net gain made from an investment or
from the prosecution of some business after the payment of all
expenses incurred.  The net gain depends largely on other cir-
cumstances than the earning capacity of the persons managing
the business.  The size and location of the town selected, the
character of the commodities dealt in, the degree of competition
encountered, the measure of prosperity enjoyed by the commu-

nity, may make an enterprise a decided success, which under less favorable circumstances, in the hands of the same persons, might turn out a failure. The profits of a business with which one is connected cannot therefore be made use of as a measure of his earning power. Such evidence may tend to show the possession of business qualities but it does not fix their value. Its admission for that purpose was error. It was also error to treat this subject of the value of earning power as one to be settled by expert testimony. An expert in banking or merchandising might form an opinion about what a man possessing given business qualifications ought to be able to earn, but this is not the question the jury is to determine. They are interested only in knowing what he did actually earn, or what his services were reasonably worth, prior to the time of his injury. In settling this question they should consider not only his past earnings, or the fair value of services such as he was able to render, but his age, state of health, business habits and manner of living: McHugh v. Schlosser et al., 159 Pa. 480. The basis on which this calculation must rest is not the possibility, as judged of by the expert witness, but the cold, commonplace facts as proved by those who knew them. It does not follow, as a necessary conclusion, that the services of the plaintiff were worth no more at the time of his injury than the $80.00 per month he was receiving from the company in whose service he was, but the fact that he accepted service at that price was an important one, and was persuasive though not conclusive evidence that the price was considered by himself a fair one.

We think the twelfth assignment also points out a substantial error. The plaintiff was hurt on the 20th day of September, 1893. In May, 1894, he was appointed postmaster at Lewistown, Pa., at a salary which leaves him a net balance of $540 per year after the payment of all expenses. He is still holding the office and in receipt of the salary. Notwithstanding this fact, the learned judge said to the jury: "It seems to the court, and we do not understand that it is denied by the defendant, that since the accident, he has been totally disabled and utterly unable to do anything." For eighteen months before this instruction was given the plaintiff had been receiving the salary attached to the office of postmaster at Lewistown and had been giving sufficient attention to the duties of the office to see that they were prop-

erly performed by his clerks and deputies. In other words, he had been earning $540 per year and was still earning it at the time the trial took place. Another subject requires consideration. The verdict rendered by the jury gives the calculation upon which the enormous sum awarded to the plaintiff was based. From this, it appears that the sum of $19,526.50 was given as the cost of an annuity of $1,750 per annum for nineteen years. This calculation assumes 1st, that the plaintiff's earning power was nearly twice as great as he had himself offered it for to the company, whose president and manager he was. It assumes, 2d, that he had a reasonable expectation of life for nineteen years, being at the time of the trial about fifty-three years old. It assumes, 3d, that his earning power instead of steadily decreasing with increasing years would hold up at its maximum to the very end of life. It assumes in the 4th place that he is entitled to recover not only the present worth of his future earnings as the jury has estimated them, but a sufficient sum to enable him to go out into the market and purchase an annuity now, equal to his estimated earnings.

The first, second and third of these are assumptions of fact. The fourth is an assumption of law and is clearly wrong. When future payments are to be anticipated and capitalized in a verdict, the plaintiff is entitled only to their present worth. This is the exact equivalent of the anticipated sums.

From what has been now said, it follows that substantially all of the assignments of error are sustained. The judgment is reversed and a venire facias de novo awarded.

STERRETT, C. J., dissents.