ILLINOIS CENT. RAILROAD CO. *v.* PORTER.

*(Jackson.* April Term, 1906.)'

1.  **COMMON  CARRIER.  R**ailway postal clerk is a passenger.
    A railway postal clerk, in the discharge of his duties on a railway
    train, is a passenger, and his rights are to be determined by
    the rules of law applicable to that relation.

    Cases cited and approved:  B. & O. R. R. Co. v. State, 72 Md.,
    36;  Arrowsmith v. Railroad Co., 57 Fed., 165;  N. Y., etc., R.
    Co. v. Seybolt, 95 N. Y., 562;  Gleeson v. Va. Midland R. Co.,
    140 U. S., 435.

2.  **SAME.  Injury to passenger.   Derailment is prima facie proof
    of negligence.  May be rebutted.**
    A passenger suing for injuries establishes a *prima facie* case of
    negligence by showing the derailment of the train and the con-
    sequent injury;  but such presumption may be rebutted by
    showing that the injury arose from an unavoidable accident,
    which could not have been prevented by the highest applicable
    degree of care and foresight.

    Case cited and approved:  Railway v. Kuhn, 107 Tenn., 112.

3.  **SAME.  Same.   High rate of speed  not  negligence  per se.**
    The mere fact that a train is running at a high rate of speed is
    not negligence, if the condition of the track and road bed, and
    the character of the engine and equipment, are such that that
    speed may be safely maintained.

    Cases cited and approved:  Railroad Co. v. Winters, 85 Tenn.,
    240;  Railroad Co. v. Milam, 9 Lea, 223;  Fitch v. Railroad Co.,
    3 Tenn. Cas., 676.

4.  **MEASURE  OF  DAMAGES.  No deduction for salary re-
    ceived by injured party as a gratuity.**
    The salary received by a railway mail clerk as a mere gratuity
    from the government during the time he was incapacitated for

Railroad v. Porter.

work, by reason of a personal injury inflicted by the negligence of another, cannot be considered in determining the amount of damages to which he is entitled in consequence of the injury.

Cases cited and approved: N. C. & St. L. Ry. v. Miller (Ga.), 47 S. E., 959, 67 L. R. A., 87; M., K. & T. R. R. Co. v. Rains, 40 S. W., 635; M., K. & T. R. R. Co. v. Flood, 79 S. W., 1106; Carroll v. Mo. Pac. R. Co., 88 Mo. 239; L. & N. R. R. Co. v. Carothers, 23 Ky. Law Rep., 1673; Pittsburgh C. & St. L. R. C. Co. v. Thompson, 56 Ill., 138; Balt. City Pass R. R. Co. v. Baer, 90 Md., 97; Regan v. N. Y. R. R. Co., 60 Conn., 134; Harding v. Townshend, 43 Vt., 536.

Cases cited and disapproved: Drinkwater v. Dinsmore, 80 N. Y., 390; Montgomery R. R. Co. v. Mallette, 92 Ala., 210; Lee v. W. U. Tel. Co., 51 Mo. App., 375; Ephland v. R. R. Co., 57 Mo. App., 147.

FROM SHELBY

Appeal from the Circuit Court of Shelby County.— WALTER MALONE, Judge.

J. H. WATSON, for Porter.

TIM E. COOPER, CHARLES N. BURCH and ALBERT W. BIGGS, for Railroad Company.

MR. JUSTICE McALISTER delivered the opinion of the Court.

The plaintiff below was in the employment of the United States in the capacity of a mail clerk, and was

assigned to duty on a fast passenger and mail train known as the "Chicago and New Orleans Limited." On the 20th of October, 1904, he sustained serious personal injuries in consequence of the derailment of the train at or near the village of Tillatoba, Mississippi. There was a verdict and judgment in favor of the plaintiff below for the sum of $2,500, from which the company appealed and has assigned errors.

The first assignment is that there is no evidence to support the verdict of the jury. It is conceded by learned counsel on the brief that the derailment of a train, inflicting injuries upon a passenger, makes out a *prima facie* case of liability, and devolves upon the company the burden of proof that the accident was unavoidable, even by the exercise on its part of the utmost degree of care, skill, and foresight. But his contention is that the plaintiff in error adduced evidence conclusively showing that the accident was unavoidable, and not the result of any negligence or want of care, skill, or foresight upon the part of the company, its servants, and agents. The contention of learned counsel is that the accident was not caused by the high rate of speed at which the train was being operated, but by reason and on account of some latent defect, which caused the rear wheels of the tender of the second engine to leave the track; but just what this defect was it has been impossible to determine, etc.

The record reveals that at the time of the accident the train, consisting of fourteen coaches, drawn by two en-

gines, was running at a rate of seventy miles an hour. The train in question was operated as a fast mail and passenger train, and was especially designed to carry with the utmost expedition the United States mail between the points designated.

The cause of the accident does not distinctly appear from the record. The evidence submitted on behalf of the company indicated that the track was in good condition, that the engines, cars, and equipment of the train were in good order, and that the employees of the company at the time of the accident were in the exercise of proper care. The superintendent of the defendant company arrived on the scene of the accident about an hour after it occurred, and states that when he arrived he found a part of the train in a ditch. There were two cars on one side of the track badly derailed, and one of them turned bottom side up; on the other side there was another, badly derailed. There were several cars off the track. "My recollection is five or six cars were standing on the track that were not derailed." The first manifest evidence of the derailment showed itself at a point about thirty feet south of the north switch and extended for a distance of 2,500 feet to the point where the cars were ditched. The indentations on the ties showed that one pair of wheels had first left the track, and a little further on the truck left the track, and then a little further on the truck slued around, and the cars already described then became derailed. According to the witness, two wheels of the front truck of the tender

Railroad v. Porter.

on the second engine first left the track, which was soon followed by the truck itself, and then the truck turned around and caused a derailment of the cars.

It further appears from the record that the accident happened on what is known as a "reverse curve," and it is insisted that it was gross negligence on the part of the company to operate its trains at such a high rate of speed on a curve of that character. The superintendent testified that this is a 3-degree curve, or a divergence from a tangent to three degrees of a circle of 360 degrees; that it was not much of a curve; that it was a reverse; that it runs from the obverse side at a tangent onto the reverse side; that it is not a stiff curve by any means.

The plaintiff testified that from his experience in the service the train was running at not less than seventy miles an hour, and that the train was nearly two hours late; that his attention was directed to the speed of the train before it left the track; that he was working at the letter case; train was running at such a rate of speed on the reverse curve that he could hardly strike the letter box, working the letters. Plaintiff testified that he had never seen the train make such speed as that over a reverse curve like that at Tillatoba. He further testified that it was an unusually sharp curve and downgrade; that it is an unusually sharp curve, and there is no downgrade worse than that on the road. The witness further testified that he had never known the train to run so fast

at that point before; that he had known it to run as fast as that on straight stretches of track, but never that fast at that point.

It should have been stated at the time of the accident the train was proceeding south towards New Orleans.

The plaintiff's testimony as to his injuries was as follows: "One bone in my left arm was broken—that was the principal surface injury at the time—and I had wounds, one on my cheek, another over my eye, several cuts and bruises on my head, and then a severe bruise and abrasion on my left hip and on each knee, and then another about half way down between the knee and the ankle, and a number of small cuts and bruises all over the surface of my body. The car was reduced to splinters almost, and a number of them were imbedded in my flesh. I was disabled for a period of five months."

Plaintiff further testified that prior to the accident he enjoyed unusually good health and had never lost any time from sickness, but that since the accident it had been very different; that he had fallen off in weight and suffered a great deal from sleeplessness; that sometimes he would only sleep an hour or two in a night, unless he was under the influence of an opiate. At the time of the accident he was in Class 4A, and getting a salary of $1,200 a year.

It should have been stated that the superintendent of the road also testified that this train was scheduled at thirty-nine miles an hour, including stops, and that at the time of the accident it was behind time. This witness

Railroad v. Porter.

further testified that the company did not limit its men in speed on these trains. "If a train is late, we have confidence in our enginemen, and we say to them: 'Make up as much of that time as in your judgment you consider entirely safe.'"

It is well settled that a railway postal clerk in the discharge of his duties on a railway train occupies the relation of a passenger, and his rights are to be determined by the rules of law applicable to that relation. *B. & O. R. R. Co.* v. *State* (Md.), 18 Alt., 1107, 6 L. R. A., 706, 20 Am. St. Rep., 454; *Arrowsmith* v. *Railroad Co.* (C. C.), 57 Fed., 165; *N. Y., etc. R. R. Co.* v. *Seybolt,* 18 Am. & Eng. Ry. Cas., 162, 95 N. Y., 562; *Gleeson* v. *Va. Midland R. R.,* 140 U. S., 435, 11 Sup. Ct., 859, 35 L. Ed., 458.

In *Railway* v. *Kuhn,* 107 Tenn., 112, 64 S. W., 203, it was said: "All the law required of the plaintiff in the first instance was to show that the defendant was a common carrier, that he was its lawful passenger and that the injury sued for was caused by the derailment and overturning of the coach in which he was traveling. That, without more, was sufficient to constitute a *prima facie* case of actionable negligence on the part of the defendant; and to rebut the presumption of negligence arising from proof of these facts it was incumbent on the defendant to prove that it had done all within its power to avoid a disaster of that kind." The presumption is not conclusive, however, but may be rebutted by showing that the injury arose from an unavoidable accident,

or an occurrence which could not have been prevented by the highest applicable degree of care and foresight.

The uncontradicted evidence on the record is that at the time the train was derailed it was running over a reverse curve at a speed of seventy miles an hour. It is true liability cannot be based simply upon the rate of speed. As said by Mr. Elliott, in his work on Railroads (volume 4, section 1589), as follows: "The speed at which trains are run is, as a general rule, a matter to be determined by the railroad company; and where there is no statute or municipal ordinance, it is very seldom indeed that a charge of negligence can be successfully maintained upon evidence that the rate of speed was very great." There may, however, be peculiar circumstances involved in a particular case which will justify the conclusion that there was negligence in running at a high rate of speed; but it would require peculiar circumstances or conditions to make the rate of speed an element of negligence. *Railroad Co.* v. *Winters,* 85 Tenn., 240, 1 S. W., 790; *Railroad Co.* v. *Milam,* 9 Lea, 223; *Fitch* v. *Railroad Co.,* 3 Tenn. Cas., 676.

The proof shows that the defendant company was accustomed to run this train at the rate of seventy miles an hour over that portion of its road, and that the exigencies of its business in the carriage of its passengers and the transmission of the government mail required the highest speed attainable within the limits of reasonable prudence and safety. The company in this case has offered no explanation of the derailment of its train, but

Railroad v. Porter.

has sought to counteract the presumption of negligence arising from the accident by proof that it had exercised proper care in the selection of its employees, that its road was in good order, and that its equipment was perfect. It further offered evidence tending to show a very efficient system of inspection both of its roadbed and track, as well as of its engines, cars and running gear.

The question still remains whether the company exercised reasonable prudence in operating its train at such a high rate of speed at the particular locality where the accident happened. The testimony of the plaintiff is to the effect that the place of the accident was on a sharp reverse curve, and down an unusually steep grade; further, that during his service as postal clerk he had never known a train to make such a high rate of speed at that particular locality; and that on this occasion the train was two hours late. While the testimony of the railroad company is that this reverse curve was only three degrees, and was therefore very slight, we are compelled to take the testimony of the plaintiff on all controverted questions of fact, since the verdict of the jury has determined them in his favor.

The trial court properly instructed the jury: "The mere fact that a train is running at a fast rate of speed is not negligence, if the condition of track and roadbed, and the character of the engine and equipment, are such that that speed may be safely maintained." But we think, upon the facts stated, there is evidence to support

the finding of the jury fixing the negligence upon the defendant company.

The second assignment of error is that the trial judge erred in declining to permit the company to show that the defendant in error did not lose any time and was paid his salary in full during the time of his disability. In this connection we will consider the third assignment of error, to the effect that the court erred in submitting to the jury the loss of time, since he had declined to permit the plaintiff in error to show that no time had been lost. The plaintiff below alleged in his declaration, not only that he had suffered great pain, both mental and physical, but that he was hindered and prevented from transacting and attending to his necessary and lawful affairs and business during all that time, and was deprived of great gain, profits, and advantages which he might otherwise have acquired. On the trial of the cause the plaintiff was permitted to testify that at the time of the accident he was earning a salary of $1,200 a year, or at the rate of $100 per month, and by reason of the accident he was disabled five months, losing that much time. On cross-examination counsel for the company endeavored to show that defendant in error had lost nothing by reason of his disability, but that his salary had been continued by the United States. This question was objected to, and the objection sustained by the court. If the witness had been permitted to answer, he would have stated that during the time he was disabled his salary was paid at the rate of $100 per month.

It is insisted on behalf of the company that the trial judge was in error in declining to permit this evidence to go to the jury, and that this error was intensified by the instruction by the trial judge in his charge to the jury on this subject, as follows: "You should take into consideration, and it is your duty to do so, the age of this plaintiff, the state of his health before the accident, the state of his health after the accident; take into consideration his loss of time, if any; take into consideration his earning capacity before and after the casualty."

It is insisted very earnestly on behalf of the company that the exclusion of this evidence by the trial judge was erroneous. The insistence of counsel is that under the rule of this court, except in cases where the assessment of exemplary damages is permissible, the true rule is compensation. In other words, the object of the law is to make the plaintiff whole, and if he has lost nothing in a pecuniary sense, from his disability, he is not entitled to damages for loss of time.

In support of this contention, counsel insists that the courts of Alabama, New York, Kentucky, Missouri, Delaware, and Pennsylvania have announced the rule that where an employee has been injured, and it appears that his employer has continued the payment of his wages, not in pursuance of any obligation of the contract, but as a mere gratuity, in such case the injured employee will not be entitled to recover from the wrongdoer damages for loss of time. *Drinkwater* v. *Dinsmore,* 80 N. Y.,

390, 36 Am. Rep., 624; *Montgomery R. R. Co.* v. *Mallette,* 92 Ala., 210, 9 South., 363; *Lee* v. *Western Union Tel. Co.,* 51 Mo. App., 375; *Ephland* v. *Railroad Co.,* 57 Mo. App., 147.

The cases of *Railroad Co.* v. *Mallette,* 92 Ala., 210, 9 South., 363, *Drinkwater* v. *Dinsmore,* 80 N. Y., 391, 36 Am. Rep., 624, and *Goodhart* v. *Railroad Co.,* 177 Pa., 1, 35 Atl., 191, 55 Am. St. Rep., 705, hold that such evidence is admissible, since the plaintiff, in order to recover for the loss of wages, is bound to show that he lost his wages in consequence of the injuries. We think, however, the sounder doctrine is laid down by the supreme court of Georgia in *N. C. & St. L. Ry. Co.* v. *Miller,* decided June 10, 1904, and reported in 47 S. E., 959, 67 L. R. A., 87. The facts of that case present a striking analogy to the case at bar, wherein a railroad mail clerk was injured in a collision of two of the defendant's trains. Mr. Justice Cobb, who delivered the opinion of the court, said:

"Error is assigned upon the following charge: 'It is immaterial whether the government paid the plaintiff anything or not. That would not affect the right of the plaintiff in this case to recover against the railroad company.' Error is further assigned upon the refusal of the judge to give in the charge a written request, which was as follows: 'Plaintiff admits in his testimony that he received from the government his regular salary during the time he did not work on account of his injury.' This being so, I charge you that he cannot recover any-

thing for the time lost, as claimed in his declaration.'"

"King, an assistant division railway mail superintendent, testified as follows: 'Plaintiff returned to work about June 10, 1903, about the time the year ended. If he had not gone back to work, he would have been granted further time, but his pay would have stopped. The government pays them for one year when they are disabled for work. This is done on the physician's certificate, for no period longer than sixty days consecutively, and not to exceed one year in total.' . . . While the statute for regulation of the post-office department under which this payment was made does not appear in the record, nor is it cited on the briefs of counsel, the payment was evidently made under the provisions of section 1424 of the Postal Laws and Regulations, which read as follows: 'Whenever a railway postal clerk shall be disabled, while in the actual discharge of his duties, by a railroad or other accident, beyond his power to control, he shall send to the division superintendent a certificate of his attending physician, or surgeon, sworn to before an officer authorized to administer oaths, who has an official seal, setting forth the nature, extent, and cause of his disability and the probable duration of the same, and such further evidence as to the character of the disability as may be necessary shall be furnished. The division superintendent will forward the certificate, with his recommendation, to the general superintendent of the railway mail service, who will submit the matter to the postmaster general, who may, in his judgment, the

facts justifying such action, grant such disabled clerk leave of absence with pay for periods of not exceeding sixty days each, and not exceeding one year in all.'

"In considering whether the assignments of error under consideration are well taken, it is necessary to determine whether the payment referred to in the testimony was of such a character as to preclude the plaintiff from claiming compensation for lost time against the railway company. When one engaged in any calling or avocation from which he derives a pecuniary benefit is compelled to give up for a time the performance of his duties as the result of an injury inflicted upon him by a wrongdoer, he is entitled, as a general rule, to demand compensation for the time thus lost at the hands of the wrongdoer who inflicted the injury. The general rule is that, where a wrongdoer causes time to be lost, he will not be heard to say that the person injured has suffered no pecuniary loss because he has received, as the result of being injured, contributions which in amount aggregate more than what would have been earned during the time. Nor will his liability be diminished to the extent of contributions which were less than what would have been earned. . . .

"We think the view taken by Mr. Watson, and which seems also to be concurred in by Mr. Sutherland and Mr. Rorer, is sounder than that which appears to be approved by the other text-writers. The wrongdoer may show in defense to a claim for lost time that no time has been lost; and this, of course, is right and just, because

Railroad v. Porter.

if no time has been lost, no compensation is due from anybody on account of lost time.   But, if time has been lost as a result of a tort, sound sense, common justice, and, it may be, public policy, would demand that the tortfeasor be prohibited from making a defense founded upon the proposition that he has been guilty of a wrong —it may be a grievous and outrageous wrong—that some third person, not only not in sympathy with the wrongdoer, but despising him and his act, has from some unworthy motive paid to the injured person an amount which, if it came from the wrongdoer, would have equaled the damages which would have been assessed against him.   There is nothing in the record to show that the government, in its contract of employment with railway mail clerks, stipulates for the payment of salary during the periods of disability, and, so far as the record discloses, when such an employee is disabled from work, he cannot, as a matter of right, demand anything from the government by way of compensation during the period of disability.   There is nothing in the testimony of the witness King to indicate that payments are made in such cases otherwise than as a matter of grace.   If we look at the postal laws and regulations above quoted, it is perfectly clear that the payment is a mere gratuity on the part of the government.   We are, therefore, not confronted in the present case with the necessity of deciding the question as to what would be the rule in the event that the injured employee, under his contract of employment, had a right to demand of his employer the

amount which he would have earned as wages during the period he was disabled. On this question we make no ruling; but we do rule that, where an employer pays to an injured employee as a matter of grace the amount which he would have earned as wages if he had not been disabled, a wrongdoer who brings about the disability has no concern with this transaction between the employer and the employee, and the amount so paid is not to be regarded as in any sense compensation for lost time."

Mr. Watson, in his work on Damages for Personal Injuries, after citing cases holding against the right to recover for loss of time where wages have been paid, says: "On the other hand, there is authority for the position that the fact that the employer did not deduct the plaintiff's salary during the time he was disabled does not affect the plaintiff's right of recovery for the value of his time. This is unquestionably the sounder view. The tortfeasor has no right to invoke in his own defense the liberality of the plaintiff's employer, whose course in this respect is especially for the benefit of the injured party, and not for that of the author of the wrong. Certain it is, finally, that few employers would continue the salary of a valued employee during a term of incapacity from injuries if the effect of this was merely to relieve *pro tanto* the party liable in damages for the tort."

*N. C. & St. L. R. R. Co.* v. *Miller,* supra, in our opinion, announces the correct doctrine and is sustained by the

Railroad v. Porter.

unquestionable weight of authority. It is further in accord with the well-settled rule that money received on accident insurance policies by the injured persons does not diminish the amount of recovery against the wrongdoer. *M., K. & T. R. R. Co.* v. *Rains* (Tex. Civ. App.), 40 S. W. 635; *M., K. & T. R. R. Co.* v. *Flood* (Tex. Civ. App), 79 S. W., 1106; *Carroll* v. *Mo. Pac. R. Co.*, 88 Mo., 239, 57 Am. Rep., 382; *L. & N. R. R. Co.* v. *Carothers*, 23 Ky. Law Rep., 1673, 65 S. W., 833, 66 S. W., 385; *Pittsburg, C. & St. L. R. R. Co.* v. *Thompson*, 56 Ill., 138; *Baltimore City Pass. R. R. Co.* v. *Baer*, 90 Md., 97, 44 Atl., 992.

In *Regan* v. *N. Y. R. R. Co.*, 60 Conn., 134, 22 Atl., 504, 25 Am. St. Rep., 306, the court said: "If the defendant is entitled to have the insurance money deducted from the amount otherwise due, it must be because it owns or has some legal claim to the money. How happens it that the defendant is entitled to this money? Not because it ever paid the premium or any part of it, nor because the policy was intended for its benefit, nor upon its request, nor because there is any privity between it and the insurance company. . . . How, then, can the defendant claim, as it does, the exclusive benefit of the insurance? It came to the plaintiff from a collateral source, wholly independent of the defendant, and which as to him was *res inter alios acta*. The defendant in my judgment has no more claim to the insurance money than it would have to money obtained upon a sub-

scription paper that the friends of Regan (the property owner) may have procured to make good his loss."

*Harding* v. *Townshend*, 43 Vt., 536, 5 Am. Rep., 304, was an action to recover damages for personal injuries received in consequence of a defect in a highway, and the defendant sought to have the recovery credited by the amount of indemnity received on an accident insurance policy. The court said: "There is no technical ground which necessarily leads to the conclusion that the money received by the plaintiff of the accident insurance company should operate as a defense or inure to the benefit of the defendant. The insurer and the defendant are not joint tortfeasors or joint debtors, so as to make a payment or suit by the former operate to the benefit of the latter. Nor is there any legal privity between the defendant and the insurer, so as to give the former a right to avail itself of a payment by the latter. The policy of insurance is collateral to the remedy against the defendant, and was procured solely by the plaintiff and at his expense, and to the procurement of which the defendant was in no way contributory. It is in the nature of a wager between the plaintiff and the third person, the insurer, to which the defendant was in no measure privy, either by relation to the parties, or by contract, or otherwise. It cannot be said that the plaintiff took out the policy in the interest or behalf of the defendant, nor is there any legal principle which seems to require that it be ultimately appropriated to the defendant's use and benefit."

Railroad v. Porter.

The trial judge, in passing on the question of evidence raised in the court below, followed the ruling in *N. C. & St. L. R. R. Co.* v. *Miller,* supra, stating, however, that in that case the question was reversed whether the deduction will be made where the money paid by the employer is part of the contract with the person entering the employment. The trial judge was of opinion that the wages paid in the present case by the government was a mere gratuity, and regulated by section 1424 of the Postal Laws, which was as follows: That section, after setting out the course to be taken by an employee who has been injured in taking out a certificate with regard to his injuries, provides: "The division superintendent will forward the certificate with his recommendation to the general superintendent of the railway mail service, who will submit the matter to the postmaster general, who may, in his judgment, the facts justifying such action, grant such disabled clerk leave of absence, with pay, for periods of not exceeding sixty days, and not exceeding one year in all." The division superintendent has first to make his recommendation of that application, and then discretion is given the division superintendent whether he will recommend the claim or not. In addition to that, the postmaster general may, in his judgment, or he may not, grant this application. It is a matter left ultimately to the discretion of the postmaster general. The court, therefore, was of opinion that this is a gratuity on the part of the United States. It is a mere case of liberal dealing with its employees. It

is not bound to pay this money, and it does it simply as a gratuity, not as a part of the contract, etc.

We entirely agree with the circuit judge in his disposition of this question of evidence.

It results that there is no error in the record, and the judgment is affirmed.