Curran, Appellant, *v.* Lehigh Valley R. R.

Argued February 3, 1930. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, SADLER and SCHAFFER, JJ.

585

*T. McK. Chidsey,* of *Chidsey, Maxwell & Frack,* with him *Francis E. Walter,* for appellant.—There was no evidence justifying permission to the jury to fix on plaintiff's decedent a higher degree of care than that required of a guest: Schlossstein v. Bernstein, 293 Pa. 245; Kilpatrick v. Transit Co., 290 Pa. 288; Dunlap v. Transit Co., 248 Pa. 130; Alperdt v. Paige, 292 Pa. 1, 6; Hilton v. Blose, 297 Pa. 458.

*E. J. Fox, Jr.,* of *Fox & Fox,* for appellee.—There was sufficient evidence to justify the jury in fixing on plaintiff's decedent a higher degree of care than that required of a guest.

OPINION BY MR. JUSTICE FRAZER, March 17, 1930:

Plaintiff appeals from refusal of the court below to grant a new trial, after verdict by the jury in favor of defendant. In the statement of claim it is alleged Daniel Curran, husband of plaintiff, was fatally injured in a

collision by an automobile, in which he was an occupant with three others, with a freight train on appellee's railroad, and that the injuries and death of Curran were caused by reckless and negligent operation of the train by defendant's employees.

The record discloses that the train with which the automobile collided was moving slowly or had come to a stop, and extended over a public grade crossing, blocking the highway at the point of the accident, and that the automobile, a closed Cadillac, in which were seated Curran and his three friends, one of whom was driving, dashed against one of the cars, composing the train, demolishing the automobile and resulting in the injuries to Curran, from which he died a few days later. The accident occurred about 10:30 at night and witnesses for plaintiff testified that the engine bell was not rung or signal lights displayed or whistle sounded.

We may here at once dispose of the question of the alleged negligence of defendant company. Notwithstanding the evidence at the trial was quite voluminous, no portion of the evidence for defendant is before us except brief summaries, appearing in the record under an agreement between the parties as to deletion of the record under our Rules (55 and 56). However, evidence of witnesses for defendant does appear on that phase of the case in the summaries and is detailed in the opinion of the court below refusing a new trial, and wholly contradicts and disproves, as the court found, the charge of negligence on the part of the railroad company's employees. Under the evidence the question was clearly one for the jury to determine, and their verdict for defendant is conclusive. In fact, this part of the case is the least stressed by appellant's counsel, and its weakness is further shown by the fact that they have not considered it sufficiently important to include it in their statement of questions involved. We consequently consider discussion of this question is not required.

Defendant contends that Curran was guilty of contributory negligence in not exercising due care and caution at the time of the accident, that he should have and clearly could have seen the railroad signal lights and heard the whistle and bell, had he used ordinary precaution,—the conclusion reached by the learned court below in sustaining the verdict of the jury.

Our examination of the evidence discloses no ground to justify a reversal of that judgment. In fact, as we read the record, the entire case is one in which the events, leading up to and culminating in the disaster at the grade crossing, progressively develop situations which show the plain lack of care on the part of plaintiff's husband in failing to avert or even attempting to avert the accident. Curran, McKelvey, the owner of the automobile, Holden, the driver, and two other friends met together at the Elks Club in the City of Easton, about 3 : 30 in the afternoon of the day of the accident; "sat there and talked for an hour," as one of the party testified. Later, either McKelvey or another of the party proposed taking a pleasure ride; the testimony as to who made the suggestion is not definitely fixed. At any rate, according to the statement of one of the group, "something came up that we should take a ride, to take a little air, or something. ...... It was a nice beautiful day. Take the air; get the fresh air." Whereupon the entire party entered McKelvey's car, the owner with them, Holden driving and continuing to drive throughout the entire trip. They started with no definite destination in view, "just driving around," as Holden explained, and on their way stopped at the homes of various friends. They visited McKelvey's brother, halted at another place to see a sick acquaintance, at another house they had refreshments; then drove to the residence of McKelvey, owner of the automobile, who then withdrew from the party, and the remaining four continued their drive in the same car. Upon leaving McKelvey's home, Holden was driving and Curran sat

in the back seat, positions they held at the time of the collision. They had no particular stopping place or object in mind. Martin, one of the party, when asked: "What did you decide to do?" replied: "No one decided on anything, I suppose"; and further on: "I wasn't keeping track of the time, because I had nothing to do and no place to go;......I wasn't in a hurry to go home."

They proceeded along the highway at a speed of from 25 to 30 miles an hour, as testified, and finally, at about 10:30 at night, neared the place of the accident. At this point the highway, an improved state road, upon which they were traveling, is crossed at grade by the track of two separate railroad companies, those of the Delware, Lackawanna and Western and those of the Lehigh Valley, defendant. The tracks of the two companies, running parallel with each other, both crossing the highway at grade, are approximately 75 feet apart, so that in driving along the roadway in either direction, when the first track is crossed, an intervening stretch of highway of that distance must be passed over to reach the track of the other company. Approaching the Delaware, Lackawanna and Western track there is a slight ascent in the highway, and, in the direction the automobile was traveling, the track of that company was the first to be crossed. Holden testified he had been traveling about 25 miles an hour, but when near the Delaware, Lackawanna and Western rails he slowed down to about 15 miles, "and," as he further testified, "looked in both directions, knowing there was a crossing below me." He saw no trains on the Delaware, Lackawanna and Western track, and drove over it in safety; and according to his testimony, as his car left the rails, he saw the train on the grade crossing of defendant's road, whereupon he disengaged the transmission, put on all brakes and swerved the car around, "to try to avoid crashing into the train."

By his own admissions, he failed to stop his car upon approaching either track and drove into the second car of the train from the engine, standing on the second track, about 75 feet from the first one crossed. His testimony that he neither saw lights nor heard signals was flatly and in detail contradicted by evidence produced by defendant. The court in banc found the following facts in support of the verdict: "The engine had its headlights lit. It carried two classification lights on either side of the headlights. It had a light in the cab and the fire box was open, causing a glow which could be seen for some distance, and the headlight on the tank pointing to the rear of the train was lit and illuminated the top of the freight cars. Additional illumination at the scene of the accident was furnished by a sign a short distance from the south of the crossing, erected upon the Pennsylvania-Edison Company's plant. This sign spelled out 'Pennsylvania-Edison Company,' and contained over 200 bulbs which were burning at the time of the accident, and which, in accordance with the testimony, caused the train to be visible to persons approaching from the north side of the crossing." It was also testified that two flagmen stood in the center of the highway flagging approaching vehicles.

Here was an abundance of very conspicuous warnings which neither the driver nor Curran was justified in disregarding, and the disregard of which constitutes plain negligence. The occupants of the automobile were fellow travelers, on an equal footing, "just riding around," with no object or fixed destination in view. Each was primarily responsible for his own safety at any moment of the ride; yet Curran at no time, and particularly when they approached the railroads, uttered a single word of caution or made the slightest effort to warn the driver to stop in the face of known danger, or used any precaution to avoid accident, as Holden testified, yet he undoubtedly had knowledge of the existence of the tracks, having crossed over them a few hours before.

The evidence clearly established the status of Curran as an occupant of the automobile. Five friends on pleasure bent, meet companionably; all agree to use a fine day by taking a pleasure trip in a car owned by one of the party. They have no particular place in view and no purpose to carry out, except to "take the air" and drive anywhere their fancy may lead them. They visited the homes of mutual friends; finally the owner of the vehicle, upon reaching his home, quits the party, the remaining four continue their enjoyable trip, with still no definite destination in view or purpose to serve. The owner has turned the car over to them for the time being, and in this social companionship they are equal managers of the vehicle, the driver on the same footing, not hired by McKelvey or either of the others, and being simply one of the group of friends. During the time McKelvey was with the party in the automobile, he went wherever the party elected mutually to go. Curran stayed with his friends under the same amiable unanimity. Under these circumstances he was at liberty to advise or caution the driver as to fast driving, or the likelihood of present or probable danger. More than that, it was his duty to do so, if he had any regard for his own safety. However, he sat in the car and offered no advice or warning. Upon approaching the tracks of the two railroads, he failed to suggest to the driver to stop, look and listen, nor did he offer to alight from the car. The testimony is wholly to the effect that he committed himself voluntarily to the action of the driver: Township of Crescent v. Anderson, 114 Pa. 643. It was thus not only the negligence of the driver, but also and separately the negligence of Curran which the testimony establishes. He assumed and retained his individual responsibility and thereby fixed, by his plain lack of due care, his own negligence: Hardie v. Barrett, 257 Pa. 42. Had he been watchful, had he been alert for danger where there was every reason to anticipate it, the abundant lights and signals could not have escaped

his notice. As one of the party in the mutual fellow-ship of a pleasure trip, he assumed for himself whatever risks might develop; and since he was entirely remiss in watchfulness for his own safety, indifferent both to the likelihood of danger and to the actions of the driver, who had no more control, as to management, over the vehicle than he had, the fact of his own contributory negligence is unquestionable.

The judgment of the court below is affirmed.