## Apfelbaum et ux., Appellants, *v.* Markley.

Argued October 25, 1938.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and

394

*Richard Henry Klein,* for appellants.

*Carl Rice,* for appellee.

OPINION BY PARKER, J., January 31, 1939:

Morris Apfelbaum and Celia L. Apfelbaum, his wife, brought an action in trespass against Sidney M. Markley claiming damages as a result of personal injuries suffered by the wife. The case was heard by a jury and, at the conclusion of the trial, the trial judge directed the jury to find a verdict for the defendant as to any claim by the husband. The jury returned a verdict for the wife in the sum of $300 and for the defendant as to the husband's claim, and separate appeals were taken by each plaintiff. While the questions raised in the respective appeals were different, they involve a consideration of the same facts and will be discussed by us in one opinion.

The plaintiffs were invited by the defendant to accompany him in his automobile as his guests on a trip from Sunbury to New York City. The parties, together with defendant's parents, left Sunbury on March 13, 1935. The husband plaintiff and the defendant's parents occupied the rear seat of the car with the plaintiff

in the center. The defendant drove the car and the wife plaintiff shared the front seat with him. When they reached a point a few miles west of Easton the car was driven off the road and it overturned, with the result that Mrs. Apfelbaum was injured.

Mr. Apfelbaum complains of the action of the trial judge in disposing of his claim as a matter of law and of the entry of a verdict against him without submitting his case to the jury. Mrs. Apfelbaum complains of certain alleged trial errors which she insists resulted in her receiving an inadequate verdict.

(1) The trial judge directed a verdict against Mr. Apfelbaum on the ground that he was guilty of contributory negligence and a new trial was denied him by the court in banc for the same reason. We assume for the purposes of this discussion that the defendant was negligent in that he drove the car for many miles at a rate of speed which was excessive under the circumstances and that such negligence was the proximate cause of the accident and resulting injuries. It had snowed during the preceding night, but Mr. Apfelbaum testified that during the trip "it was just the least little mucky but it wasn't bad," and that there was snow on the berm of the road. There was testimony that while the road for the most part was clear, there were patches of ice and snow here and there on the driveway. The appellant admitted that he observed the conditions of the road.

As the parties left Gilberton, the defendant was driving his car at the rate of at least sixty miles per hour when his mother cautioned him about his fast driving. The defendant slowed down some but promptly resumed the previous speed except when passing through towns. He continued the speed of sixty miles per hour for from one-half hour to one hour before the accident. About five minutes before the accident Mrs. Apfelbaum remonstrated with the defendant for his fast driving. He did not then slacken his speed and when he was driving

down a small hill the car skidded to the left, to the right, and again to the left when it left the road, traveling thirty-five or forty feet before it turned on its top and came to rest.

These facts were all known to Mr. Apfelbaum. We quote from his own testimony: "You say that Mr. Markley drove at sixty miles an hour? A. Yes, sir. Q. Where was the first place on this trip that he drove at that speed? A. I would imagine—I can't imagine, I must be specific—I am used to driving fast. Q. It doesn't bother you? A. It don't bother me, and even on the road from here to Shamokin or even from Ashland to Shenandoah and Gilberton there is clear paving over there. Q. What about it? A. That was where he was driving fast, when his mother called his attention to it...... Q. Did you object to it? A. I didn't say anything. Q. Did you at all on this trip? A. I didn't say anything. Q. At no time before the accident? A. I didn't say anything...... Q. In other words, your wife said something about a quarter of a mile before the accident? A. Yes, sir. Q. Did he reply to her? You said that he sneered? A. He just looked at her and started to smile...... Q. Did he decrease his speed then? A. No, sir...... Q. At Ashland, until you got down to Bowmanstown, his driving was about the same speed all of the way, wasn't it?—except, of course, when you were going through towns—on the open road? A. I didn't mind it— Q. I am not asking you whether you minded it or not. I say it was about the same speed, wasn't it? A. Yes."

Under the husband plaintiff's own admissions the accident did not occur in a sudden emergency but as a result of negligence which had continued for a considerable period. He did not complain of the defendant's fast driving when the danger was obvious to him; on the contrary, he willingly joined the driver in testing the danger. He is responsible for the consequences of his own act. "The rule is well established that, when

possible dangers, arising out of the negligent operation of a hired vehicle or a conveyance in which one is riding as an invited guest, are manifest to a passenger, who has any adequate opportunity to control the situation, if he sits by without protest and permits himself to be driven on to his injury, this is negligence which will bar recovery. In other words, the negligence of the driver is not imputed to the passenger, but the latter is fixed with his own negligence when he joins the former in testing manifest dangers [citing numerous cases]": *Hardie v. Barrett*, 257 Pa. 42, 46, 101 A. 75; *Ellenberger v. Kramer*, 322 Pa. 589, 591, 186 A. 809.

The extent to which one riding as an invited guest in an automobile should anticipate an impending peril and act in relation thereto depends upon the facts of each case: *Cormican v. Menke*, 306 Pa. 156, 164, 159 A. 36. While the plaintiff's actions were probably more than passive, even if they were only passive then he must be presumed to have taken the risk incident to driving at a reckless speed under the road conditions present and known to him: *Nutt v. Penna. R. R. Co.*, 281 Pa. 372, 376, 126 A. 803; *Kilpatrick v. Phila. R. T. Co.*, 290 Pa. 288, 295, 296, 138 A. 830.

To this the appellant replies that he was not required to warn the driver of what the latter already knew and appreciated, citing *Vocca v. Penna. R. R. Co.*, 259 Pa. 42, 102 A. 283; *Jerko v. Buffalo, R. & P. Ry. Co.*, 275 Pa. 459, 119 A. 543; *Beck v. Director General*, 268 Pa. 571, 112 A. 34. All three of these cases involved guests in a car which collided with a train at a grade crossing. The point in issue on appeal in each case was whether the alleged contributory negligence of plaintiff was so clear as to warrant binding instructions against him. Likewise, in each case the duty to speak arose in a sudden emergency. The drivers saw all that the guests saw, and it did not appear by indisputable evidence that at the time the guest might have spoken the driver was not then endeavoring to avoid the danger that

both saw. Under such circumstances no good purpose would have been served by the guest's interference while he might have increased the peril by backseat driving. What the court said as applicable to those situations was correct, but that is far from saying that a guest is never required to remonstrate with a driver who is negligent. In those cases there was no point in calling the driver's attention to the approaching crossing when the driver was at that very time apparently endeavoring to avoid the danger which he knew. To hold with the plaintiff that there was no duty to complain if the driver knew he was negligent would be in the teeth of a myriad of cases decided by the appellate courts: *Hill v. Phila. R. T. Co.*, 271 Pa. 232, 236, 114 A. 634; *Wagenbauer v. Schwinn*, 285 Pa. 128, 131 A. 699; *Curry v. Riggles*, 302 Pa. 156, 153 A. 325; *Curran v. Lehigh Valley R. Co.*, 299 Pa. 584, 149 A. 885; *Highton v. Penna. R. R. Co.*, 132 Pa. Superior Ct. 559, 1 A. 2d 568. Even a wife who, with knowledge of the facts, sits by her husband's side and sees him drive so as to violate the law, without protest, is guilty of contributory negligence: *Curry v. Riggles*, supra (p. 160) ; *Alperdt v. Paige*, 292 Pa. 1, 140 A. 555; *Rhodes v. Penna. R. R. Co.*, 298 Pa. 101, 147 A. 854.

The appellant also urges the proposition that there was no duty upon the part of the appellant to protest since he heard another guest in the car make a protest to the driver. We have no doubt that there might be situations in which the remonstrance of one guest might protect another. However, in determining the duty of the guest, the circumstances of time, duration of the negligence, conduct, reaction of the driver to the complaint, character of the negligence, and the like, should be taken into account. When the mother of the driver remonstrated, the driver slowed his speed for a time and then he resumed it. When the wife plaintiff remonstrated, the reaction on the part of the driver was disclosed by a sneer rather than a smile. This was at least

five minutes prior to the accident. This circumstance called for positive action on the part of the appellant. It is impossible to read his own testimony without concluding that he approved of the conduct of the driver in operating the car. It is not strange that the driver, in view of the appellant's attitude, continued to test a danger. The husband appellant stated that he had been driving a car for many years, that he knew the condition of the road, and that he was aware of the speed. He at least must be presumed to have assumed the risk.

The appellant admits that he does not find any Pennsylvania case in support of this proposition, but does refer to the case of *Ragland v. Snotzmeier*, (Ark.) 55 S.W. (2nd) 923. While the decision in that case is not binding on us, even an examination of the case gives little support to appellant's contentions for the circumstances were quite different from those found here.

(2) Due to the accident, Mrs. Apfelbaum was unable to give any attention to the management or operation of the store for a period of six months after she was injured. The jury allowed damages of $300 to compensate her for pain and suffering and for loss of earnings from the date of the accident, March 15, until the middle of September when she returned to work. We are all of the opinion that the trial judge erroneously excluded certain evidence offered by her which was intended to show actual impairment of her earning power and that a new trial must be granted on that account.

A small retail ladies' clothing store was conducted in Sunbury, Pennsylvania, in the name of Celia L. Apfelbaum. Mrs. Apfelbaum and her husband gave their time to the operation of the store and a seamstress and a bookkeeper were also employed. The concern sold ladies' apparel, dresses, coats, and millinery. Prior to the accident Mrs. Apfelbaum did from seventy-five per cent to ninety per cent of the actual selling in the store. She was assisted occasionally by the bookkeeper. As

the sales involved trying on dresses and fitting, the husband did not do any selling but confined his attention largely to buying, in which service she also participated. She examined all the purchases made for the store and if, in her opinion, the merchandise was not suitable, she returned it.

There was evidence from which the jury could have found that Mrs. Apfelbaum had a large clientele who depended upon her skill and taste in making choice of purchases and many patrons insisted upon trading with her. A clerk employed to make sales during her six months' absence from the store did not furnish the same skill or selling ability as Mrs. Apfelbaum did, the clerk being paid $12 a week. A clerk was also hired on Saturdays who was paid $2.50 per day for such service. There was a noticeable decrease in the business of the store during her absence as compared with like periods in the preceding years. The trial judge limited her claim for loss of earnings to the amount so paid for the help which was actually hired. Mrs. Apfelbaum testified as follows: "Q. Who was the owner or proprietor of the business at the time of the accident? A. I was, my husband and myself. By the Court: Q. What did you say? A. My husband and myself—I was. By Mr. Klein: Q. You did business under what name? A. Under C. L. Apfelbaum. Q. That is Celia? That is yourself? A. That's my name...... Q. Were you doing business as an individual at the time of the accident? A. Yes." We quote from the husband's testimony on this subject as follows: "Q. At the time of the accident who was the owner of this business that has been testified to? A. My wife, C. L. Apfelbaum. Q. What was the name under which you operated? A. C. L. Apfelbaum."

The trial judge held as a matter of law that the husband and wife conducted the store as partners. In view of the contradictions in the testimony and the fact that the witnesses stated conclusions rather than the facts from which those conclusions could be drawn, we have

serious doubt as to the right of the trial judge to deter-
mine as a matter of law that the husband and wife were
partners. There was no evidence showing who fur-
nished the capital or what, if any, partnership agree-
ment, oral or written, existed. They maintained a home
and the returns from the store were used, after paying
operating expenses, for the maintenance of their home.
Undoubtedly the husband joined her in the conduct of
the business but whether he did so as a partner does
not appear to us as clear as it did to the trial judge.
As we have said, this question may take a different angle
on a retrial of the case.

Considering the evidence received and the offers re-
jected, it seems quite apparent that Mrs. Apfelbaum
suffered a loss of earning power greater than that repre-
sented by the wages paid to the clerks who substituted
for her. "The services of a man who, like the plaintiff
in this case, has, by his personal labor, skill and busi-
ness ability, built up and managed a business for a
period of years, is manifestly worth more than the mere
cost of hiring another temporarily to fill his place. The
thorough knowledge of the business thus acquired, to-
gether with the personal acquaintance with the cus-
tomers, has a value in the commercial world readily
recognized by any business man. This being so, no
valid reason appears why one responsible for an in-
jury should be heard to say that damages based upon
such considerations are merely conjectural": Dempsey
v. City of Scranton, 264 Pa. 495, 503, 107 A. 877.

This brings us to the real question in the case which
is whether certain evidence offered by the plaintiff and
rejected by the trial court was competent and relevant
for the purpose of evidencing the loss of her earning
power. The plaintiff offered to prove by a witness,
Philip Fehr, who was engaged in the retail ladies' ready-
to-wear business in Sunbury, that he had been engaged
in that business for a number of years and was familiar
with the business of the plaintiff; that he knew the ex-

tent and character of her business and the value of her services; that in his opinion the plaintiff's services in that business between March and September were worth $75 a week; that the falling off in the plaintiff's business was due entirely to the absence of the plaintiff from the business and not to any other causes; that he knew the merchants who were engaged in similar business and knew what it would cost to hire another person or persons to do work of the same character that the plaintiff did; and that the employees who were hired could not render service of the same value as that of the plaintiff. Offers were also made to prove some of these same facts by Mr. and Mrs. Apfelbaum. The court in overruling the objection relied upon the case of *Gilmore v. P. R. T. Co.*, 253 Pa. 543, 98 A. 698, to which we will later refer. The plaintiff also offered to prove by Mr. Apfelbaum, after qualifying him to speak to the subject, that there was not a substantial amount of capital invested in the business; that the success of the business was due to the management of the business by the wife; that her absence caused a falling off in the volume of business; that this decrease was not due to other causes; and generally to show by the books of the concern an actual picture of the decrease in earnings.

A determination of the loss of earning power involves an inquiry into the "comparative physical and intellectual laboring capacity of the person injured, before and after the accident. Profits derived from the management of a business are generally not to be considered as earnings": *Dempsey v. City of Scranton*, supra (p. 498). Profits may depend upon many other matters than the physical and mental labor of the injured party: *Goodhart v. Penna. R. R. Co.*, 177 Pa. 1, 15, 16, 35 A. 191. In short, the terms "profits" and "earnings" as here used are not synonymous.

However, there are situations where little or no capital is employed and the profits are almost entirely the result of personal effort, and in such case the profits are

a reasonable measure of earning power. There are other cases where the capital investment is comparatively small and the profits do not furnish' an absolute standard of earning power, but they do furnish some evidence tending to show what the actual loss of personal earnings has been. There are many cases in which evidence of profits has been held to be relevant, as the profit of a boardinghouse keeper (*Wallace v. Penna. R. R. Co.,* 195 Pa. 127, 45 A. 685), and profits from farming and trucking *(Buckman v. P. & R. Ry.,* 227 Pa. 277, 75 A. 1069; *McLane v. Pittsburgh Rys. Co.,* 230 Pa. 29, 38, 79 A. 237). Also, see *Boggess v. B. & O. R. R. Co.* 234 Pa. 379, 83 A. 356, where the profits were derived from a partnership.

"The general rule established by the decisions and principles above referred to, so far as the subject-matter admits of the statement of a general rule, is that the income or profits an injured person derives from a business personally conducted with little or no capital and depending entirely or substantially upon his undivided labor and skill, whether physical or mental, may be considered as affording the true measure of his earning capacity; but income or profits derived from a business requiring the investment of substantial capital or in which the injured person is engaged with others or where he employs the labor of others, cannot be accepted as a measure of earning capacity. In the latter case, the measure of loss is the value of plaintiff's services in the business...... In either case, inquiry into the character of the business is necessary, also the capital and assistants employed, and if the case falls within the second class depreciation in profits is properly admitted only where they can be shown to be the direct result of plaintiff's absence, in which case they are received, not as a distinct element of damage, but as evidence of the value of plaintiff's services": *Dempsey v. City of Scranton,* supra (p. 502).

Two lines of proof were offered by the appellant, the

one the testimony of a competent witness offered to show the value of the plaintiff's service in the business, and the other to show the value of such service as reflected by earnings. We are all of the opinion that it was error to reject the testimony of Philip Fehr as proposed in the offer which is the subject of the eighth assignment of error. In *Simpson v. Penna. R. R. Co.,* 210 Pa. 101, 104, 59 A. 693, a witness shown to have specific knowledge of the "plaintiff's business and of the manner in which he conducted it and the time and attention given to it," was allowed to testify to the worth of such services. While the testimony there was meager, the offer made in the present case filled the gaps in the testimony in the Simpson case, thus making it a much clearer case. The principle applied in the Simpson case is controlling here. Likewise, in the case of *Dempsey v. City of Scranton,* supra (p. 503), the Supreme Court said: "In the latter case [where there is a substantial capital investment], the measure of loss is the value of plaintiff's services in the business." That is what plaintiff here offered to show.

As to the alternate line of proof, we need only say that the court, in our opinion, erred primarily in excluding the offer to prove the amount of capital invested in this business and the remaining portion of the offer which proposed to show the comparative relation of the personal service of this plaintiff to the return from the capital as part of the business. When those facts are developed, it may or it may not appear that comparative profits are some evidence, not as an absolute measure of loss of earning power, but as some evidence to be taken with all the other facts from which the jury may make a reasonable and logical deduction as to the alleged loss of earning power, "physical and intellectual."

The case of *Gilmore v. Phila. R. T. Co.,* supra, relied upon by the court below, is distinguishable in several respects. There is nothing in that case which implies that this plaintiff could not, by competent evidence,

show the value of her earnings. Even as to profits the case is not controlling here for Gilmore did not, as the opinion notes (p. 548), "contrast a defined period of time before the accident with one of like duration thereafter." Neither was there any offer in that case to show that the decrease in profits was due exclusively to his impaired physical condition. There was here. Gilmore continued to perform twenty per cent of the work done by him prior to the accident while Mrs. Apfelbaum took no part in her business for six months, the period for which she claims the loss. It is unnecessary to discuss the assignments of error which contain statements of law as stated by the trial judge in his charge to the jury. The charge was in accord with the rulings made as to the admission of evidence. The harm was all done by the errors in the exclusion of testimony. A new trial must be granted.

The judgment for the defendant as to the claim of Morris Apfelbaum (No. 13 October Term, 1938) is affirmed. The judgment for Celia L. Apfelbaum (No. 14 October Term, 1938) is reversed and a new trial is awarded.