Halloway *v.* Carnegie-Illinois Steel Corporation, Appellant.

Argued November 12, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and GUNTHER, JJ. (ARNOLD, J., absent).

138

*P. K. Motheral,* with him *Reed, Smith, Shaw & Mc-Clay,* for appellant.

*Murray J. Jordan,* with him *Fred J. Jordan,* for appellee.

OPINION BY ROSS, J., April 14, 1953:

This is a workmen's compensation case wherein the claimant, Mrs. Cleather Halloway, seeks compensation for herself and her three minor children for the death of her husband, Troy Halloway. The compensation authorities found in favor of claimant and made an award. The employer, Carnegie-Illinois Steel Corporation (now United States Steel Company), appealed to the County Court of Allegheny County, which court dismissed its exceptions and entered judgment on the award, and this appeal by the employer followed.

The deceased was employed by the defendant at its Homestead plant as a laborer. On November 6, 1948 he left home for work at about 7 a.m. and checked in for work at the defendant's plant on the 8 a.m. to 4 p.m. shift. He did not check out of the plant when he should have at the end of his work day and a fruitless search was conducted for him on November 6 and the following day. In the course of the search Halloway's street clothes were found in his locker in the plant locker room.

On November 14 a "derrick boat" operated by employes of the defendant was engaged in dredging silt from the Monongahela River in front of a water intake installation constructed by the steel corporation on the

river bank adjacent to its plant. At about 5:15 p.m. the "clam shell bucket" of the boat struck and raised the body of Halloway, which had been submerged about 12 feet out from the face of the water intake installation. The compensation authorities found as a fact that the deceased died as the result of drowning on November 6, 1948, and this finding is not questioned by defendant.

The principal question in this case is raised by the following finding of fact made by the referee and affirmed by the board: "ELEVENTH: Your Referee finds as a fact that the decedent met his death by accidental drowning on the premises under the control of the defendant company and near where the decedent would have to work, and during the course of his employment." The crux of the defendant's argument is that there is no competent evidence to support the conclusion that deceased met his death "near" where his duties required him to be. Defendant contends that Halloway's duties were limited to that part of its plant known as "Open Hearth Building No. 5" or "O H 5", which is some 300 feet from the pier of the water intake.

The evidence bearing on the question of the area over which the deceased performed his duties may be summarized as follows: Claimant's witness, Raymond Hunt, a fellow employe, testified that Halloway "worked all over the place" and that "he was a handyman. . . . he did a little of everything". In response to the question "Do you know whether or not he was sent from one part to another to work any place?" the witness answered, "Yes, he was." The testimony of Otis Gray, another of Halloway's fellow employes, is as follows: "Q. Do you know the type of work that Troy [Halloway] did? A. Of course I do. Q. Was he a general laborer there? A. He is a general laborer. . . .

Q. Did you see him at different parts of the mill? A. Yes, I saw him different parts of the mill. Q. Would he go most any place in the mill, to do his work? A. Yes, he would. Ernest Craighead testified that he was employed by the defendant as a "track maintenance crew man" and that he performed his duties "all over the plant". He stated that he had seen Halloway in defendant's works at places other than "O H 5", and also testified that on one occasion he had seen the deceased "passing" what he described as the "track shanty", a location within the defendant's plant and lying about one-half mile from "O H 5".

The defendant's witness William Willett, one of its employes, testified that on November 6, 1948 he saw the deceased "around twenty minutes of four" passing through a locker room in "O H 5" "in the direction of the shower room". The witness testified that he had seen Halloway "at different places near the open hearths" and that once he had seen him "in front of this locker room washing a car". George Joseph Koval, testifying for the defendant, stated that he was a "turn foreman in masonry materials" and that on November 6 Halloway was a member of his crew. Koval stated that he assigned Halloway various tasks in the "O H 5" area which would have taken him his full turn to complete. Koval last saw deceased at 1:45 p.m. on November 6 in the "brick storage area between sixty-nine and seventy furnace". This point is approximately 600 feet from the water intake pier and within what has been described as "O H 5".

It is apparent that the compensation authorities chose to discard defendant's evidence which tended to establish that Halloway had duties only within the "O H 5" area of the plant. "It is the prerogative of the compensation authorities to give the testimony such consideration as it may deserve, and to accept or re-

ject it in whole or in part accordingly." *Barkus v. Thornton-Fuller Co.,* 157 Pa. Superior Ct. 239, 242, 42 A. 2d 320. Upon evidence that the deceased was a "general laborer" and "handy-man" who did "a little of everything" for the defendant "all over" its plant, the compensation authorities found that Halloway met his death on defendant's premises and in the course of his employment.

In its brief the appellant states: ". . . it may be permissible to infer that Halloway's death was accidental and that he was precipitated from the river bank into the river in some way, at some place, possibly near where his body was found", and it does not question that the "river bank" was part of its premises. However, it does contend that at the time of the accident the deceased was not at or near a point on its premises where his duties required him to be and, therefore, was not in the course of his employment.

In support of its contention the appellant relies upon *Hunter v. American Steel & Wire Co.,* 293 Pa. 103, 141 A. 635. In that case the facts were these: On the morning of the 27th of November, 1923, the dead bodies of Hunter and Boyd, employes of the defendant, were found at Donora in the Monongahela River close to the shore of defendant's property. Both had been drowned. Hunter had for some time prior to the accident been in the employ of the defendant as a stationary engineer. On the night of November 23, 1923, he and Boyd and two other employes were in the engine room at work, and at 9:15 p.m. both men, clad in their working clothes, left the engine room. Hunter was not afterwards seen alive. Boyd was last seen some minutes after 9:15 p.m., about 9:30, when he entered a paint shop alone, greeted a workman, took a drink of water and immediately departed. Nothing more was heard or seen of either man until four days later when

Hunter's body was discovered in the river lying partially under the lower end of a barge that was moored to pilings supporting a long boardwalk or deck, both owned and utilized for unloading material required by defendant. The body of Boyd was found in the same vicinity a few hours later. The river at the point where Hunter's body was found was 350 feet from his "proper working place". The claim for compensation was disallowed by the referee. The compensation board, after a hearing de novo, reversed the finding of the referee and awarded compensation. This conclusion was affirmed by the Court of Common Pleas of Westmoreland County. The Supreme Court reversed the judgment of the lower court on the ground that Hunter had "apparently" abandoned his employment.

We think that the *Hunter* case is distinguishable from the present one. There Hunter had a *fixed* place of employment 350 feet from the place where his body was found and "nothing in the nature of his employment required his presence within at least 125 feet from the Monongahela River where his body was found". With those facts before it the Court could find no explanation for his proximity to the river consistent with his course of employment. In this case the employe had no fixed place of employment and hence his presence at or near the river bank, while unexplained, may be assumed to have had some connection with his work. If we exclude from our consideration (as we must in view of the findings of the compensation authorities) that evidence which indicates that Halloway had no duties outside O H 5, there is no evidence that he had actually abandoned his work or that he was engaged at the time of the accident in something wholly foreign to his employment.

In our opinion this case is ruled in favor of the claimant and the award must be sustained under the

authority of *Tappato v. Teplick & Eisenberg Co.*, 133 Pa. Superior Ct. 231, 2 A. 2d 545, and *Wolsko v. American Bridge Co.*, 158 Pa. Superior Ct. 339, 44 A. 2d 873.

In the *Tappato* case, the employe met his death during working hours by falling down an elevator shaft. The employer occupied the fifth and sixth floors of a six-story building. Deceased worked on the sixth floor. The employer testified that deceased had no work on the fifth floor and that without permission no one was allowed to go from the sixth to the fifth floor and that deceased did not request permission to do so on the day he was killed. There was no direct testimony of any definite rule forbidding employes to leave the floor of their employment without the employer's permission. No one saw the accident, but when the deceased's body was found in the elevator pit he was without his coat and otherwise dressed as he had been when working. The elevator was stationed at the sixth, or top, floor. It was conceded that the deceased did not fall from the sixth floor. The employer contended that the deceased was not in the course of his employment at the time of his death. With respect to this contention this Court, in affirming a judgment for the claimant, stated at page 234: "In compensation cases where there are, as here, unexplained circumstances attending a fatal accident, the prevailing rule is that, if an employee was last seen at his work, he is presumed to have continued at his employment, in the absence of evidence to the contrary." And at page 236: "In the instant case, there is no testimony to support the finding that the deceased had actually abandoned his work, or that he was engaged at the time of the accident in something wholly foreign to his employment, or that he had received positive orders not to go to the fifth floor. He was injured during working huurs on the employer's premises. It may be fairly assumed, therefore, that he went to that

floor in the performance of some duty in connection with his work, or for some purpose that did not take him out of the course of his employment."

The factual similarities between the *Tappato* case and the case before us are obvious. In each case the cause of the fall was completely unexplained. In each, there was evidence indicating that the employe's presence *may* have been required at the place from which it was assumed he fell, but in neither was there evidence showing that his presence was actually required at such place in the performance of his duties. In each, the employe when last seen alive was at work on the premises of his employer. And, finally, each employe when found dead was dressed in his working clothes but the body was not found on the "premises" of the employer. It was, however, a completely reasonable inference that the employe in the *Tappato* case fell to the elevator pit from the fifth floor, and that here Halloway fell from the water intake pier—or some point nearby—into the river.

In the *Wolsko* case claimant's husband, George Wolsko, was employed by the defendant in its shipyard. On the day he was killed Wolsko was to report for work on the 5 p.m. to 2:30 a.m. shift. Between 4:30 p.m. and 5 p.m. he was seen on the main deck of a landing ship tank which was being constructed in the *southways* of defendant's shipyard. Wolsko's work the previous day had been on a landing ship tank located in the *northways* of the shipyard. The distance between the northways and the southways was between 500 and 1100 feet. In some unexplained manner Wolsko fell 35 feet from the bow of the LST No. 286 in the southways to the concrete pavement below it and died before reaching the hospital. The referee made an award in favor of claimant and her minor son. The board reversed the referee and disallowed compensation. The

board was sustained by the County Court of Allegheny County. We reversed the court. We held in doing so that the board erred in placing upon the claimant the burden of establishing that the presence of the deceased was necessary at the place where the accident occurred. We stated, inter alia, at pages 347 and 348: "The most that can be said in the present case is that deceased was not at the exact place on defendant's premises where his duties were to be performed when he was fatally injured. But he had entered the premises of defendant—the shipyard—where his presence was required. . . . Neither the purpose nor the motive for his presence on landing ship tank No. 286 was established. But there might be several proper and natural reasons for his being in the southways of the shipyard. McAdams v. Pearson and Ludascher, 92 Pa. Superior Ct. 152, 157. There is no sufficient testimony to show that he had abandoned his employment, or that he was engaged in something entirely foreign thereto, or that he acted contrary to any positive orders of his employer, or that he was a trespasser."

It is well established that since the compensation authorities found in her favor, the evidence must be viewed in the light most favorable to the claimant and she must be given the benefit of every inference reasonably deducible therefrom. *Hockenberry v. State Workmen's Insurance Fund,* 133 Pa. Superior Ct. 249, 2 A. 2d 536; *Darmopray v. Budd Mfg. Co.,* 169 Pa. Superior Ct. 200, 82 A. 2d 341. With that principle in mind, we are of the opinion that the findings of the compensation authorities are supported by substantial competent evidence and that the award was properly made.

Judgment affirmed.