Joner v. Made-Rite Paper Box Co., Inc.

Before Milner, P. J., Waters and Ullman, JJ.

*James W. Kelly*, for claimant.

*Penrose Hertzler*, for defendant.

ULLMAN, J., December 28, 1959.—This is an appeal by claimant from a decision of the Workmen's Compensation Board. This proceeding was initiated by a petition for termination of the compensation payable under an open agreement for total disability resulting from an accident in the course of claimant's employment on December 15, 1956. In it the employer and its insurance carrier alleged under oath that all disability ceased on April 2, 1957, and that claimant returned to work on April 3, 1957, without further disability or loss of earning power resulting from the injury caused by the accident. As will hereinafter appear, there was no foundation of fact whatsoever to support either of these allegations and the conclusion is inescapable that defendants must have so known when the petition to terminate was filed on or shortly after May 24, 1957. The referee, after taking testimony, found that claimant was still totally disabled and dismissed the petition. Upon appeal to the Workmen's Compensation Board, the board set aside the referee's seventh finding of fact, which read: "As a direct result of the injuries sustained while in the course of her employment with the defendant, claimant is totally disabled"; and substituted therefor a finding of fact that claimant had a 10 percent disability.

The law is clear and well settled that on a petition to terminate or modify, the burden of proof is upon defendant, for it is they who seek to change the status

created by the parties themselves in the execution of the open agreement for total disability: Carson v. Real Estate-Land T. & T. Company, 109 Pa. Superior Ct. 37, 40. In Poellot v. B. & O. Railroad Co., 109 Pa. Superior Ct. 471, 475, the court, speaking through Judge, later Justice, Parker, said:

"The defendant having been the actor, the burden of proof was upon it to show either that the disability which resulted from the accident was entirely removed or that the disability had been so reduced that the claimant would not be entitled to receive as much compensation as was provided for in the open agreement. If it failed to sustain this burden, claimant was entitled to a finding of fact that the disability was unchanged."

Whether defendant has met this burden is a question of fact for the referee and the board and not for the court. "A court is not permitted to weigh the evidence or to substitute its findings for those of the compensation authorities if there is legally competent evidence to support them": Curran v. Walter E. Knipe & Sons, Inc., 185 Pa. Superior Ct. 540, 545. Section 422 of the Pennsylvannia Workmen's Compensation Act of June 21, 1939, P. L. 520, 77 PS §834, provides in its first paragraph:

". . . all findings of fact shall be based only upon sufficient competent evidence to justify same."

In determining whether there is sufficient competent evidence to justify the finding of the board that claimant's disability had changed to a 10 percent partial, we must view the evidence in the light most favorable to defendant and give it the benefit of all inferences reasonably deducible therefrom: Rice v. Public Meat Market, 166 Pa. Superior Ct. 328, 329. See also Gower v. Mackes, 184 Pa. Superior Ct. 41, 44; Halloway v. Carnegie-Illinois Steel Corporation, 173 Pa. Superior Ct. 137; McAvoy v. Roberts & Mander Stove

Company, 173 Pa. Superior Ct. 516; Lemmon v. Pennsylvania Department of Highways, 164 Pa. Superior Ct. 254, 258, and cases there cited. Likewise the credibility of the witnesses is for the fact-finding bodies and not for the courts: Icenhour v. Freedom Oil Works Company, 136 Pa. Superior Ct. 318. And it is the prerogative of the compensation authorities to give the testimony such consideration as it may deserve and to accept or reject it in whole or in part accordingly: Barkus v. Thornton-Fuller Co., 157 Pa. Superior Ct. 239, 242.

The law is equally well settled, however, that whether or not there is sufficient competent evidence to support a particular finding of fact is a question of law and may be reviewed on appeal: Monahan v. Seeds & Durham, 336 Pa. 67, 74; Minner v. Reno, 138 Pa. Superior Ct. 37, 38. To the same effect see Diaz v. Jones and Laughlin Steel Corporation, 170 Pa. Superior Ct. 608, 615; and Giallonardo v. St. Joseph's College, 177 Pa. Superior Ct. 87, 93.

The issue before the court on this appeal therefore narrows down to whether there is sufficient competent evidence to sustain the substituted seventh finding of fact of the Workmen's Compensation Board to the effect that claimant had a 10 percent disability. Since the finding in question is not supported by relevant competent testimony, the decision of the board cannot be sustained.

The record discloses that claimant was injured in the course of her employment on December 15, 1956. The agreement subsequently entered into, being agreement 6680146, describes the accident and injury as follows: "Tying box, twine slipped and cut web between her third and fourth fingers right hand." The agreement was an open agreement for total disability. There are several peripheral facts in the agreement which are worthy of notice. The agreement gives the

date disability began as December 27, 1956. The agreement is dated March 13, 1957, was received in Harrisburg April 4 and approved by the Workmen's Compensation Bureau on April 9, 1957. Even assuming that it was executed on the date it bears, March 13, 1957, this was clearly substantially more than six weeks after the date that disability began and under the provision of the Workmen's Compensation Act of 1939, as amended, section 306 (e), 77 PS §531, claimant was entitled to compensation for the first seven days of disability. Notwithstanding this, the agreement provides for the payment of compensation for total disability beginning January 3, 1957. In passing, it may be noted, therefore, that the agreement itself clearly short-changes claimant of one week of compensation. It may also be noted that this agreement of total continuing disability was not filed with the bureau, which is prerequisite to its validity, until after, according to defendant, all disability had in fact ceased.

Claimant has a congenital anomaly whereby the webbing of the fingers of each of her hands extends down between the second joints of the fingers. Following her injury infection developed and she was treated with penicillin and operated on on December 31, 1956, by Dr. Herman Parris, who incised and drained the area. Claimant, however, continued to have difficulty with the hand and it was kept bandaged in a position of flexion, like a fist. The insurance company thereupon removed her from the care of Dr. Parris and put her under the care of Dr. Raymond O. Stein, an orthopedic surgeon, who examined her on January 16, 1957, and found there were flexion contractures of all the knuckles of the metacarpal phalangeal joints. Dr. Stein felt that the cut and laceration were pretty well healed and he did not think the infection presented any further problem, and arranged for her to receive physical therapy of the hand three times a week "from the period of

January 15th to the middle of February". He stated "it became obvious that we were not gaining any additional function and the fingers were not straightening out" and on February 7, 1957, he operated on claimant to reduce the scar tissue between the third, fourth and fifth fingers which left a gap in the skin which he covered with a skin graft, and he then also did a plastic repair which he described as a "z" type, whereby the web was cut out and reshaped.

Postoperatively the hand was put in a splint and claimant was discharged from the hospital on February 15, 1957. Subsequently, when the stitches were removed in his office, the doctor found the wound had healed and the skin grafts had taken nicely, so that the hand was then usable as contrasted to an unusable hand before the operation. He again started physical therapy and applied what he designated as a Bonnel elastic splint designed to urge the fingers into extension, because there was still contracture in the interphalangeal joints. Claimant wore this splint for a while, but in the doctor's opinion, not as actively as she should have. Physical therapy was continued until some time in April of 1957. During this time a lot of the postoperative swelling in the hand tended to subside, but she showed "very limited improvement in the function of her hand." Dr. Stein testified:

"In April of 1957 I recommended that Sophie go back to work and I recommended that she go back to work primarily because I wanted her to start using the hand in an active manner. *I felt if she returned to work she would get a good deal of therapeutic benefits.* I felt there had been a considerable improvement in the status of the hand over what it was originally. I felt if I could get her to using the hand in a relative normal manner she would continue to get some improvement with the hand. I also felt we would never end up with a completely normal hand. There would be some residual

difficulty. I argued she go back to work on April 3rd and she did go back to work for a short period of time and then came back to see me on April 18th; I guess at which time *she said she just could not use it to work. I did not feel that physical therapy per se or additional treatment would solve the problem.* I felt the patient would have to do it herself."

Dr. Stein then testified that he advised her to continue working as a therapeutic measure. Just how claimant would continue working when she said she just could not use the hand to work, and just how she could continue working in the light of the compensation authorities' sixth finding of fact, neither Dr. Stein nor anybody else undertook to explain, nor is it by any means clear to the court.

Claimant testified that she did return to work on the recommendation of Dr. Stein on April 3, that the employer gave her several types of work, that she worked four hours a day for four days and that she wasn't able to do any one of the various types of work, and that the employer, Mr. Sacks, told her he had nothing she could do and he wasn't going to let her come back until her hand got better.

This testimony was uncontradicted. If it had not been true, nothing would have been easier than for defendant to appear as a witness and deny it. This defendant did not do; nor did defendant employer appear or testify in support of the allegations in defendant's petition to terminate that all disability had ceased on April 2 and that claimant returned to work on April 3 without further disability or loss of earning power resulting from the injury. In Mahoney v. Francis Mulholland Roofing Company, 135 Pa. Superior Ct. 498, 505, the Superior Court held:

"It is a legal presumption that a party who withholds testimony bearing on his case does so because its effect

would not be beneficial." See also Harkins v. Varone, 306 Pa. 376, and cases therein cited.

This, of course, is a presumption of fact for the consideration of the finders of fact. The referee stated in his sixth finding of fact:

"On April 8, 1957, as a result of the injuries sustained, claimant was unable to perform her duties and her employer sent her home until such time as her disability would not prevent her from performing her duties as prior to the injury."

This finding of fact was not disturbed by the board and is therefore the finding of the compensation authorities.

Advising claimant, therefore, to do work that she could not do, at an employment which she could not get, would seem of dubious therapeutic value, and the fact that Dr. Stein testified that it was "imperative" that she do such work neither persuaded defendant employer to provide it, nor did it enable claimant to perform it.

Dr. Stein testified that there is no doubt that she had some disability in the hand, and was then asked:

*"Taking the body as a whole,* the patient as one unit, to what extent would you say she is disabled as a result of the injury, *taking the body as a whole?"*

Before answering the question, Dr. Stein pointed out that a disability for one type of occupation "would not be good for another", and described the disability. Dr. Gordon was called by defendant, and Dr. Glauser called by plaintiff also described the hand, and the referee had the benefit of seeing and examining the hand himself. As a result he described it as follows in his third finding of fact. This finding of fact also was not disturbed by the board and is therefore the finding of the workmen's compensation authorities. It reads as follows:

"3. As a direct result of the injury sustained claimant suffers a marked contraction of all fingers of the right hand due to scars on the palmar surface at the

base of three fingers and the dorsal aspect of the ring finger with the appearance of the 'bishop's blessing' elevation of the last two fingers by the extensor tendons".

Dr. Stein then answered the question as follows:

"The disability is twenty-five or thirty per cent, perhaps, but I think translated to *a body disability* I should say it would be roughly ten per cent or a little more perhaps in that neighborhood.

"Q. Doctor, if she had carried out your instructions as to the treatment and use of the physical manipulations of it *in connection with her work*, you say she would still have some residual disability as a result of the injury?

"A. Yes, I think so.

"Q. Suppose she had carried out the instructions and directions, to what extent do you believe she would be disabled as a result of the accident?

"A. Not more than half of that, five per cent disability would be reasonable *for the body as a whole*."

From this testimony two things are clear, first that the instructions for ameliorating her condition were the instructions to manipulate it "in connection with her work", and second, that the 10 percent referred to is a physical disability of 10 percent of the body as a whole, a concept which, as will be hereinafter pointed out, is meaningless in connection with The Pennsylvania Workmen's Compensation Act.

Under cross-examination, Dr. Stein again said that claimant had told him that when she returned to work she wasn't able to do it, but that he thought she should have continued anyhow. It may well be that the good doctor did not know that defendant employer had refused her the opportunity to work. He further testified that further surgery could be performed, but with dubious benefit, and that physical therapy consists of the "active use of the hand which is painful and takes

individuals with a strong will and a real desire to work against that". It further appeared that at the time of the hearing on November 7, 1957, the hand had contracted a little bit more because of the development of scar tissue, than the condition in which he had last seen it on April 17, and that about the only thing she could do was make a fist.

Defendant also called a Dr. Francis Gordon. If Dr. Gordon has any specialist's qualifications, they were not placed on the record. He examined claimant on August 20, 1957, stated that he had heard Dr. Stein's testimony and he agreed with him. He testified:

"A. Well, I agree with Dr. Stein and I have the same percentage basis of twenty-five per cent of the hand, and translated in terms of the body approximately ten per cent. This I found in McBride's Disability Evaluation . . ."

He went on to testify that he agreed with Dr. Stein that as part of the cure and rehabilitation of claimant that she manipulate her hand in her work. Dr. Gordon also did not explain the practical therapeutic value of this advice in view of the testimony accepted by the Workmen's Compensation Board that she could not do the work and that her employer would not give it to her.

This was defendant's case, and unless claimant or her witness assisted defendant in making out its case, this is the testimony upon which the modification of the board must stand or fall. Claimant's testimony and that of her physician, Dr. Glauser, added no strength to defendant's case. Dr. Glauser, who is a qualified surgeon connected with a number of hospitals, examined the claimant on April 1, 1957, the day before defendant alleges all disability had ceased and she was able to return to work without loss of earning power. Dr. Glauser's description of the injury was substantially in accord with the referee's sixth finding of fact

heretofore quoted. Dr. Glauser, recommended a series of operations and considerable physiotherapy post-operatively pointing out that she "has lost the volar cup and has atrophy of disuse of the muscles of the right hand." On November 5, two days before the hearing, he found the condition to be the same and stated "her hand is permanently crippled". Dr. Glauser also was of the opinion that with only one operation, no matter how claimant used the hand, the result would be the same.

In addition to the testimony heretofore pointed out by claimant to the effect that she was unable to do the work, and that the employer told her he wasn't going to let her come back until the hand got better, she testified under cross-examination that she had not tried any other job, but that she did her housework. This concluded the testimony.

On this state of the record the referee dismissed the petition, finding her still totally disabled.

On appeal to the Workmen's Compensation Board, the board vacated the seventh finding of fact, to wit, that claimant was totally disabled, and substituted a finding of fact that the claimant had a 10 percent disability. In the order which followed, for some reason the board dated the modification as of April 8, 1957, the date claimant was no longer able to stay at work, but in view of the disposition we are making of this case, this is not important. It is clear beyond peradventure that the board based its modification on the testimony of Dr. Stein and Dr. Gordon that the overall body disability was 10 percent or slightly more, and emphasizes the fact that the testimony also indicated that claimant failed to follow the treatment prescribed for her by her physician, and then states:

"It is evident that this refusal was in part responsible for an increase in her disability from five per cent to ten per cent."

The board then stated that since Dr. Stein was the treating physician the referee should have given greater weight to his testimony and accordingly set aside the referee's seventh finding of fact that claimant was totally disabled, and substituted in lieu thereof a finding of 10 percent.

The difficulty is not with the credibility of Dr. Stein's appraisal of 10 percent of the body as a whole. The difficulty is that such an appraisal is meaningless under The Pennsylvania Workmen's Compensation Act. In Michetti v. State Workmen's Insurance Fund, 143 Pa. Superior Ct. 458, 462, the Superior Court said:

"There is no formula that can be applied to determine the amount of the loss of earning power with exactness."

If there were such a formula it certainly could not be a certain percentage of impairment of the body as a whole, and under the Pennsylvania act, the law is clear and well settled that the disability contemplated by the act is the *loss of earning power* due to the injury. This may vary widely depending on many factors. To take just one of them, disability is the inability to perform work for which the injured man is physically and memtally qualified. An impairment of the index finger of the right hand, for example, not so great as to constitute a specific loss, would cause little or no disability to a teacher or a lawyer. It would cause somewhat more disability to a laborer or a coal miner. If the kind of work for which the injured man was qualified required the manipulation of small parts, such as a watchmaker, the loss of earning power would be still greater, and the maximum loss of earning power for precisely the same injury might result for a person whose livelihood depends upon great manual dexterity, such as an orthopedic surgeon like Dr. Stein, or a musician such as a pianist or a violinist. All would have the same impairment of the body as a whole but

their loss of earning power from the same injury would vary very widely. In Goodhart v. The Pennsylvania Railroad Company, 177 Pa. 1, 15-16, it was said:

". . . loss of earning power is not always easy of calculation. It involves an inquiry into the value of the labor, physical or intellectual, of the person injured before the accident happened to him, and the ability of the same person to earn money by labor, physical or intellectual, after the injury was received . . .

"It was also error to treat this subject of the value of earning power as one to be settled by expert testimony . . . The basis on which this calculation must rest is not the possibility, as judged of by the expert witness, but the cold, commonplace facts as proved by those who knew them."

In the recent case of Cunningham v. Guerrina this very question of the validity of an opinion based on a percentage of anatomical disability was before this court as of Court of Common Pleas No. 3, December term, 1957, no. 2318. There, Dr. Henry S. Weider, Jr., testified on behalf of the employer who was seeking a modification from total to partial that in his opinion there was a 25 percent permanent partial disability based solely on an estimate of his anatomical disability. Dr. Gilbert Fineman, claimant's medical witness, agreed with his anatomical estimate, but testified that taking into consideration all other factors involved, the employe's industrial disability was total, and his earning power had been destroyed. The referee there made an award of 50 percent permanent partial, but the board upon appeal dismissed the petition to modify and directed payments for total disability. This court, in an able opinion by Judge Charles A. Waters, pointed out that other factors than the anatomical appraisal must be considered in determining the extent of disability. "The claimant's mental outlook, his industrial background, his education and the occupation, if any,

he could perform where his particular physical impairment would not be a total bar, and whether such work exists are all factors to be considered in the determination of total disability." On appeal to the Superior Court, this decision was affirmed in 188 Pa. Superior Ct. 288 in an opinion by Judge Watkins, who pointed out that while the medical witnesses were in accord as to the anatomical disability, there were many other factors which must enter into the evaluation of compensable disability.

In Unora v. Glen Alden Coal Company, 377 Pa. 7, 12, the Supreme Court, speaking through Mr. Justice Musmanno, said:

"Total disability, however, in the nomenclature of workmen's compensation proceedings imports economic as well as physical findings. Professor Arthur Larson, presently dean of the University of Pittsburg Law School, well stated in his book on Workmen's Compensation Law (Vol. 2, Sec. 57, 10, pp. 2, 3) that: '. . . the disability concept is a blend of two ingredients, . . . the first ingredient is disability in the medical or physical sense, as evidenced by obvious loss of members or by medical testimony that the claimant simply cannot make the necessary muscular movements and exertions; the second ingredient is de facto inability to earn wages, as evidenced by proof that claimant has not in fact earned anything . . .

" 'The proper balancing of the medical and the wage-loss factors, is, then, the essence of the "disability" problem in workmen's compensation.'

"In the interpretation of the Workmen's Compensation Act the word 'disability' is to be regarded as synonymous with 'loss of earning power.' Chief Justice Kephart expressed this proposition with praiseworthy accuracy and succinctness in Woodward v. Pittsburgh Engineering & Construction Co., 293 Pa. 338, 340:

'The disability contemplated by the act is the loss, total or partial, of the earning power from the injury.'

"A physician studying, on an anatomical chart, the malady of his patient in correlation to unaffected organs and members may well conclude that the subject is only partially disabled. That same doctor could, however, come to a different conclusion if he saw the patient in the depths of a coal mine laden with heavy equipment, bent under a low ceiling, coughing from bad ventilation and slipping from insecure footing. It is obvious that a one-legged man is only partially disabled at a desk addressing envelopes but entirely hors de combat in a quarry carrying blocks of stone.

"Thus, the determination of total disability is one which requires a consideration and weighing (in addition to the anatomical facts) of such factors as the claimant's mental outlook, his industrial background, his education, the occupation, if any, he could perform where his particular physical impairment would not be a total bar, and whether such work exists. Where the injured person can handle only a specially-created job, one light of effort and responsibility but laden with rest and comfort (employment plums that do not often dangle from the tree of everyday economics) the burden is on the defendant-employer to show that such a job is in fact within reach. If proof of that fact is not presented, the claimant then is entitled to a finding of total disability."

Dr. Gordon, agreeing with Dr. Stein's testimony of 25 percent of the hand and 10 percent of the body as a whole, stated frankly that he was basing these percentages on McBride's Disability Evaluation. The 5th Edition of Disability Evaluation by Dr. Earl McBride shows very clearly that Dr. McBride is talking of anatomical disability, and that only. In the opening sentence of his book he defines disability as follows:

"Disability is a term that implies a transformation of body structures which results in a depreciation of normal ability to perform the functions of established physical accomplishments."

Further down on the first page he discusses the origin of disability and sets forth five types of pathological states which result in disability, beginning with hereditary malformations such as club feet, dislocation of the hip and malformed spinal vertebrae, and ending with injuries which cause ankylosis, shortening of a limb, amputation or deformity of the body structures. Percentages of disability based on such pathological states alone may be relevant in our sister State of New Jersey, where compensable disability is normally based largely and primarily on physical impairment of the body, but in Pennsylvania, where compensation is based on the loss of wage-earning ability concept they are inadequate and insufficient unless supplemented by the many factors pointed out above, all of which are missing in this case.

Nor was the failure to include them mere inadvertence, for the questioning of able and experienced counsel for defendant was pinpointed to impairment of the body as a whole. He asked Dr. Stein: "Taking the body as a whole, the patient as one unit, to what extent would you say she is disabled as a result of the injury taking the body as a whole?" True, Dr. Stein did say that he knew the type of work that she did was to wrap and tie boxes. That is not a very complete or exhaustive description.

He was asked if he were familiar with her educational background "and such", and replied he was familiar with it. Since he did not put whatever information he had upon the record, it was of little help to the compensation authorities and is of little help to this court.

One more point remains to be discussed. This petition was filed under the second paragraph of section 413, which reads, insofar as it is relevant, as follows:

"The Board . . . may, at any time, modify . . . or terminate an original or supplemental agreement or an award . . . upon proof that the disability of an injured employee has decreased . . . or has temporarily or finally ceased." 77 PS §772.

In other words, it involves a change in claimant's status, an alteration for the better in claimant's disability, i.e., earning power. The open agreement for total disability in this case bears the date in the upper left-hand corner 3/13/57, but was sent to the Workmen's Compensation Bureau so as to be received on April 4, 1957, and was approved by the Bureau on April 9, 1957. An agreement becomes effective only as of the date that it is approved. As of the date that it was received by the bureau, and as of the date it was approved by the bureau, the agreement recites that claimant was then totally disabled. She was paid compensation for total disability up until April 2, 1957. The only way in which there was any change on the next day was that she returned to work for the defendant employer. Why did she return to work? On the advice of defendant's physician, Dr. Stein, as a therapeutic measure. With what result did she return to work? After working half time for four days she was unable to continue, and her employer refused to give her further work until her hand got better. The effect of her abortive attempt to return to work as a therapeutic measure was not to disprove but to substantiate the condition of total disability which admittedly existed on April 2nd. Where, then, was there any change in claimant's disability upon which a petition to terminate could be predicated?

It is also worthy of note that the petition to terminate is dated May 24, 1957, and sets forth that claimant

was paid compensation from January 3, 1957, to April 2, 1957. As heretofore pointed out, as of April 2, claimant was entitled to compensation from December 27. The interim receipt which accompanied the check which claimant received for compensation was dated May 24, 1957, the same date as the petition to terminate, at a time when the employer knew that her endeavor to work had proved abortive and that he had refused to give her further work until her hand was better. Nevertheless, defendant alleged under oath in its petition that on April 3 claimant had returned to work without further disability or loss of earning power resulting from the injury caused by the accident occurring on December 15, 1956. When this petition was filed the employer knew this was not true. It further sets forth as a ground for termination that the disability of claimant resulted from the injury caused by the accident ceased on April 2, 1957. If the employer and the insurance company then had Dr. Stein's reports, they knew this was not true, and if they did not have Dr. Stein's reports, to so aver would indicate a reckless disregard for what the true facts were. This is not a mere unimportant technicality. Section 413 of the act under which this petition was filed provides in its last paragraph:

"The filing of a petition to terminate or modify a compensation agreement or award as provided in this section shall operate as a supersedeas, and shall suspend the payment of compensation fixed in the agreement or by the award, in whole or to such extent as the facts alleged in the petition would, if proved, require": 77 PS §774.

From April 2, 1957, to date claimant has not received one cent in compensation for the substantial and permanent disability which, according to defendant's own testimony, exists. It is an abuse of the process provided in the act, which cannot be justified, to

avail oneself of the supersedeas and withhold payments of compensation, even for the amount provided in the board's award, and it is hoped that this practice, which is not uncommon on the part of some insurance carriers, will be discontinued.

It is also hoped that the practice which exists on the part of a number of defendant's doctors of expressing their opinion as to disability in percentage of impairment of the body as a whole will be discontinued. As a matter of fact, it is no part of a doctor's function to express an opinion as to percentages of disability, bearing in mind that disability has the meaning which has hereinbefore been dwelt upon. Dr. Glauser, claimant's doctor, should not have had it held against him by the board in that he had not done so. It is the function of the compensation authorities and not of any physician to determine the extent of compensable disability. It is only competent for a doctor to express an opinion in that issue where it appears that in addition to knowledge of the physical damage the doctor in fact did have a knowledge of the many other factors which go into an appraisal of loss of earning power. Neither Dr. Stein nor Dr. Gordon had such knowledge or, if they did have it, it was not placed upon the record.

There is, therefore, no relevant competent testimony upon which the board's seventh finding of fact can be based, and as a matter of law it must be set aside.

The board mentioned but did not act upon its statement: "It is evident that this refusal (i.e., to use the hand at work as a therapeutic measure) was in part responsible for an increase in her disability from five per cent to ten per cent." As has heretofore been pointed out, there was no refusal on the part of claimant to return to work. She tried. She could not do it. Her employer refused to permit her to continue to try. Although the board did not act upon that thought, defendant's able counsel has argued it in his brief on this appeal relying upon Zbieg v. Rochester & Pittsburgh

Coal Company, 175 Pa. Superior Ct. 308. Since the board did not rely upon this, no useful purpose would be served by discussing the Zbieg case, but inspection of it will show that it is readily distinguishable upon its facts. Defendant's own testimony in this case showed that the use of the hand which they wished claimant to undergo, and which she endeavored in fact to undergo, was painful and takes an individual of strong will to go through with. It is one thing for a doctor to lecture as to the value of painful excercise; it is quite another for the patient who must bear the pain. Different people have different thresholds of pain and different capacities to endure it. The law must have, and has, an understanding of and compassion for those who are not heroes and cannot persevere in the face of pain. Unless such inability to endure pain is feigned and not real, neither medicine nor the law should ignore it.

Since the insurance carrier and the employer had the burden of establishing the basis for termination or modification of the agreement and created a record inadequate to support its position, it is now bound by that inadequacy. Under such circumstances the law does not require that the record be remanded for further hearing and determination: Giallonardo v. St. Joseph's College, 177 Pa. Superior Ct. 87; McGrath v. Herzog, 126 Pa. Superior Ct. 229. We therefore make the following order:

*Order*

And now, this December 28, 1959, claimant's exceptions to the decision of the Workmen's Compensa- Board are sustained, and the seventh finding of fact and order of the Workmen's Compensation Board are set aside and the petition to terminate filed by the employer and its insurance carrier is denied. It is not possible to enter judgment in accordance with the mandate of the Superior Court in Graham v. Hillman Coal

& Coke Company, 122 Pa. Superior Ct. 579, 586, for the reason that no maximum amount is fixed by the law as it now stands for compensation for total disability. This difficulty has been remedied by an act recently passed by the legislature, but which does not become effective until January 30, 1960. We, therefore, direct claimant's counsel to submit for approval an order for the entry of judgment in favor of the claimant and against defendant and defendant's insurance carrier for compensation for total disability at the rate of $26.13 a week for the period December 27, 1956, to January 3, 1957, the original seven days to which claimant is entitled and for which she was not paid, and for compensation for total disability at the rate of $26.13 a week from April 3, 1957, to date, together with interest thereon in accordance with the provisions of the act, and it is further ordered that compensation continue to be paid to claimant, subject to any future termination, modification, suspension or reinstatement justified by the death of claimant or by a change in the character of her disability, and to liquidation at any time and from time to time for the aggregate of installments then due and unpaid, together with interest thereon as prescribed by the act.